# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF DOCUMENT DISCREPANCIES

FILED
CLERK, U.S. DISTRICT COURT

MAR 18 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

To: ☑ U.S. District Judge / ☐ U.S. Magistrate Judge Dale S. Fischer

From: Derek Davis _____, Deputy Clerk    Date Received: 3/7/2019

Case No.: 2:17-cv-05872-DSF-KS _____ Case Title: Brunilda Stephens v. Nordstrom, Inc. et al

Document Entitled: Amicus Curiae Brief in Opposition, Reply Brief in Further Support of Request

---

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

| | | |
|---|---|---|
| ☐ Local Rule 5-4.1 | Documents must be filed electronically |
| ☐ Local Rule 6-1 | Written notice of motion lacking or timeliness of notice incorrect |
| ☐ Local Rule 7-19.1 | Notice to other parties of ex parte application lacking |
| ☐ Local Rule 7.1-1 | No Certification of Interested Parties and/or no copies |
| ☐ Local Rule 11-3.1 | Document not legible |
| ☐ Local Rule 11-3.8 | Lacking name, address, phone, facsimile numbers, and e-mail address |
| ☑ Local Rule 11-4.1 | No copy provided for judge |
| ☐ Local Rule 11-6 | Memorandum/brief exceeds 25 pages |
| ☐ Local Rule 11-8 | Memorandum/brief exceeding 10 pages shall contain table of contents |
| ☐ Local Rule 15-1 | Proposed amended pleading not under separate cover |
| ☐ Local Rule 16-7 | Pretrial conference order not signed by all counsel |
| ☐ Local Rule 19-1 | Complaint/Petition includes more than 10 Does or fictitiously named parties |
| ☐ Local Rule 56-1 | Statement of uncontroverted facts and/or proposed judgment lacking |
| ☐ Local Rule 56-2 | Statement of genuine disputes of material fact lacking |
| ☐ Local Rule 83-2.5 | No letters to the judge |
| ☐ Fed. R. Civ. P. 5 | No proof of service attached to document(s) |
| ☑ Other: | No application for permission to file was received with these documents. Judicial review is required. *The court does not require further input from amicus* |

**Please refer to the Court's website at www.cacd.uscourts.gov for Local Rules, General Orders, and applicable forms.**

---

### ORDER OF THE JUDGE/MAGISTRATE JUDGE

IT IS HEREBY ORDERED:

☐ The document is to be filed and processed. The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk. Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____     _____
Date                                          U.S. District Judge / U.S. Magistrate Judge

☑ The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to counsel.* Counsel* shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.

MARCH 18, 2019     _____
Date                                          U.S. District Judge / U.S. Magistrate Judge

* The term "counsel" as used herein also includes any pro se party. See Local Rule 1-3.

By Fax



RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT

MAR - 7 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

1  N. Alai
2  14 Monarch Bay Plaza, Suite 383
   Dana Point, CA 92629
3  714-886-9707
4  On Behalf of AMICUS CURIAE

5

6              IN THE UNITED STATES DISTRICT COURT
7            FOR THE CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
8

9  BRUNILDA STEPHENS, et al.         CV 17-05872 DSF (KSx)
10        Plaintiff[s],              JUDGE:  Hon. Dale S. Fischer
                                     Courtroom: 7D
11            v.

12                                   **REPLY BRIEF**
13  NORDSTROM, INC. ET AL.           **IN FURTHER SUPPORT OF**
    Defendant[s].                    **"REQUEST FOR LEAVE OF COURT**
14                                   **TO FILE AMICUS CURIAE BRIEF**
15                                   **IN OPPOSITION TO PLAINTIFF**
                                     **COUNSEL ROLAND COLTON'S**
16                                   **APPLICATION AS LEAD CLASS**
17                                   **COUNSEL"; AND**
18                                        **(1) REQUEST TO STRIKE AND**
19                                   **SEAL COLTON'S OPPOSITION**
                                     **AND DECLARATION DATED JAN**
20                                   **28, 2019.**
21                                        **(2) REQUEST TO HOLD**
22                                   **COLTON IN CONTEMPT FOR**
                                     **VIOLATION OF COURT ORDERS**
23
24
                                     [Filed herewith DECL. SIAMAK
25                                   NABILI, M.D.]
26
                                     - 1 -
27  REPLY BRIEF IN FURTHER SUPPORT OF "REQUEST FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN
       OPPOSITION TO ROLAND C. COLTON'S  APPLICATION FOR  LEAD  CLASS COUNSEL"
28

**TO THE HONORABLE COURT, PARTIES, AND ATTORNEYS OF RECORD:**

Non-party Nili Alai herein moving party or "amicus curiae" respectfully files the herewith Reply Brief in support of her "Request for Leave of Court to file the referenced amicus curiae brief <u>in Opposition</u> to Plaintiff counsel Roland C. Colton's application for lead class counsel" in Case No. CV 17-05872 DSF (KSx) (herein "*Nordstrom*").

Moving party further files this Reply brief and attached Lodgment of Exhibits in support of the request to do the following:

(1) Request to <u>Strike and Seal</u> Plaintiff Counsel Colton's Opposition and Colton Declaration dated Jan. 28, 2019 for violation of Court Orders and Attorney Client Privilege documents;

(2) Request to grant the Request to hold Colton in contempt for violation of the aforementioned;

(3) Request to grant leave to file the referenced amicus curiae brief; and

(4) Support the Court's earlier Order to Show Cause, and ruling denying Roland C. Colton's adequacy as class counsel.

## SUMMARY OF RELIEF SOUGHT

Amicus Curiae respectfully seeks an order of the Court *granting* leave to file the amicus brief, and to order Plaintiff counsel Roland Colton as inadequate as class counsel. In light of Plaintiff counsel Colton's since surreptitiously filed Opposition to the Request, further relief is requested in the form of

(1) An order of the court to seal and strike the 1/28/2019 pleading and declaration;

(2) An order granting the Request to hold Colton in contempt for violation of the aforementioned; and

(3) An award of costs, fees and sanctions in favor of moving party.

This application is filed herewith Declaration of *non-party* witness in Support: Decl. Siamak Nabili, M.D.

## STATEMENT OF FACTS

On Jan. 25, 2019 Amicus curiae, a non-party to the Nordstrom litigation filed a request for leave of court to file an amicus brief in <u>support</u> of the Court's prior Order denying class certification and lead class assignment to Plaintiff's counsel Roland Colton. The original Request brief was properly served on all parties, including current case Claimant The State of California, Franchise Tax Board (for Roland C. Colton tax debt;  *see* https://www.ftb.ca.gov/aboutFTB/Delinquent-Taxpayers.shtml)

<u>On Jan. 28, 2019</u> Plaintiff's counsel Roland Colton surreptitiously filed a pleading entitled "Plaintiff's Opposition to Amicus Curiae Brief" and an accompanying "Declaration of Roland Colton".

(1) Counsel Colton failed to serve moving party in any manner, hence moving party had no manner in which to timely know of the Colton's Opposition.

REPLY BRIEF IN FURTHER SUPPORT OF "REQUEST FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN OPPOSITION TO  ROLAND C. COLTON'S  APPLICATION FOR  LEAD  CLASS COUNSEL"

(2) Counsel Colton's pleading was substantively flawed, and is subject to a strike and seal order for Colton's' violation of multiple statutes including

- Colton violated Bus. and Professions Code § 6068 (e)(1): Client Confidentiality;
- Colton violated State Bar Rules of Professional Conduct, Rule 3-100; and
- Colton violated public policy.

Plaintiff counsel Colton's Jan. 28, 2019 pleading and declaration did the following blatant and egregious acts:

(1) Colton released without authorization about ten (10) attorney client protected emails about non-party and former client Siamak Nabili, M.D. (Decl. Nabili ¶¶3-4) (See Decl. Colton 1/28/19 Exh C);

(2) Colton willfully violated other attorney client privilege of former client, and non-party Siamak Nabili, M.D. (See Decl. Nabili ¶¶3-4);

(3) Colton blatantly violated attorney client privilege of his former client Nili Alai, M.D. (See Decl. Colton 1/28/19 Exh C);

(4) Colton knowingly violated three court orders which specifically entered orders as to a court ordered anonymized case about his clients, which was ordered so as warranted by exceptional circumstances and ordered to remain anonymized.  (See Decl. Colton 1/28/1 ¶5 );

On or about January 31, 2019 Colton's legal malpractice lawyers made a written

demand that moving party withdraw the amicus brief to this Court, or "else".

On February 5, 2019 Colton himself wrote the communication attached hereto as Exhibit "C" and demanded that moving party withdraw the amicus brief or "else".

On February 6, 2019 Colton filed an *ex parte* application with Superior Court demanding four reliefs, which were <u>all ultimately denied</u> at hearing on 02/07/2019. ( See Exhibit "B" . <u>On February 6, 2019 at 1:34 pm Colton and his legal malpractice lawyers served a *wildly* broad application in Superior court seeking the court's Orders for the following demands:</u>

      (1) Colton demanded the court to order Plaintiff to withdraw an amicus curiae brief filed in another venue (Central District Court herein 2:17-cv-05872-DSF-KS *Brunilda Stephens v. Nordstrom, Inc. et al,* (herein "Nordstrom Court") ;

      (2) Colton demanded to extinguish Plaintiff's litigation privilege and all right to petition;

      (3) Colton demanded an Order to Plaintiff to refrain from broadcasting in court pleadings that Defendant is a convicted federal criminal, which is regrettably completely true; and

      (4) Colton demanded the court  issue a global "gag order" where the party may not file in any court briefs about Colton,  or say anything about Colton in any other court, agency, or process.

**<u>PLAINTIFF COUNSEL COLTON'S "OPPOSITION" AND EXHIBITS TO ARE UNLAWFUL AND SHOULD BE STRICKEN AND SEALED BECAUSE</u>**

(1) Colton's Jan 28, 2019 Opposition is in violation of multiple Court Orders which subjected him to maintain an anonymized case ordered as exceptional circumstance, as such, which Colton blatantly and willfully failed to do,  (See Decl. Colton 1/28/19 ¶5);

(2) Colton's Jan 28, 2019 Opposition begins on page 1 with irrelevant, defamatory, and slanderous misstatements which have no bearing on the Court's ruling  deeming  him inadequate as class counsel;

(3) Colton's Opposition subjects him to just and well deserved discretionary strike and seal orders pursuant to statue for deliberate inclusion of "irrelevant, false, or improper matter inserted in any pleading";

(4) Colton's Opposition is in direct violation of unambiguous Court Orders dated about August 17, 2017 and September 14, 2014  in a anonymized case, the details of which and number which can not be referenced here pursuant to the court orders (In camera Exhibits of referenced Court Orders can be provided, which are also in direct possession of Counsel Colton);

(5) Colton's 1/28/2019 "Opposition", "Declaration", and Exhibit "C" to his "Declaration"  are a blatant and intended violation of attorney client privilege of non-parties, which have never been waived; (Decl. Nabili ¶¶ 3-6);

(6) Colton now also contends that the Court should simply dispense with this meritorious and *overdue* amicus brief to deem him unfit, simply because Colton previously represented amicus curiae, and those involved various legal matters;

REPLY BRIEF IN FURTHER SUPPORT OF "REQUEST FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN OPPOSITION TO  ROLAND C. COLTON'S  APPLICATION FOR  LEAD  CLASS COUNSEL"

(7) Colton fails to recognize that his Opposition should really reference and discuss why he believed he is fit to be appointed as class counsel, as opposed to Colton's "wag the dog" litigation scheme whereby Colton's Opposition makes vacuous *ad hominem* attacks on amicus curiae, none of which have any bearing on (1) Colton's failure to disclose his criminal past and current tax delinquencies; (2) Colton's failure to truthfully list his qualifications for the court as to hundreds of million dollars of class action awards, whereas he simultaneously filed under oath (false) bankruptcy proceedings just a year or two after his purported winnings in his many class actions.(Plaintiff "Colton Response too Order to Show Cause re Adequacy of Counsel" 2/6/2018 4:25-28)

(8) Counsel Colton's 1/28/2019 arguably unlawful, and at best salacious, "Opposition" and "Declaration" are a further reference as to precisely why amicus curiae assert why Colton is likely unfit as lead class counsel.

Notwithstanding Plaintiff's Counsel Colton's intent to deflect the merits of the Request for leave to file the amicus Brief, Colton's conduct of violating attorney client confidences ( Decl. Nabili ¶¶9-10) meets the statutory qualification to deem him unfit as class counsel. Pursuant to Bus. and Professions Code § 6068(e)(1) et. seq, Colton's conduct qualifies as unlawful and in violation of public policy.

REPLY BRIEF IN FURTHER SUPPORT OF "REQUEST FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN OPPOSITION TO ROLAND C. COLTON'S APPLICATION FOR LEAD CLASS COUNSEL"

## PLAINTIFF'S COUNSEL COLTON  IS A PURPORTED SEASONED LAWYER WHO CAN NOT CLAIM A LAY PERSON'S LACK OF SOPHISTICATION OR KNOWLEDGE.

Colton is a self-described seasoned and knowledgeable legal person who cannot hide behind the traditional lay person ignorance. It is unlikely if not impossible that Colton is in any manner is unaware of the rules of pleadings, Bus. and Professions Code §6068 (e)(1), State Bar Rules,  and requirements that he comply with statute.

Colton is not only an attorney who posses the skill and sophistication to know that neither the State Bar Rules of Professional Conduct, Code of Civil Procedure, nor Rules of Court should not be circumvented. Colton  also should know it is improper and unethical to violate client confidences and the other morally improper conduct described herein.

Therefore, Colton's Jan. 28, 2019 vexatious "Opposition" and "Declaration" in support of his attempt to essentially circumvent class lead counsel adequacy criteria ordered by this court, are in bad faith and constitute his attempt to further circumvent these court Rules and Orders.

## PLAINTIFF COUNSEL COLTON'S IMPROPER PLEADINGS ARE ALSO AN IMPROPER USE OF THE COURT'S PROCESS FOR NEFARIOUS PURPOSES, AND HENCE JUSTIFY SANCTIONS AND A CONTEMPT ORDER.

Moreover, Colton's referenced 01/28/2019 pleadings are in unequivocal violation of Bus. and Professions Code § 6068 (e)(1) as to at least one of his former clients, non-party, Dr. Nabili . (Decl. Nabili ¶ 9-10). Colton has made no attempt to balance his desire to *oppose* an amicus brief on just grounds, versus Colton's highly unprofessional and charged pleading which without regard, violated multiple client's

1    attorney work product, and privilege, not to mention blatantly and willfully violates

2    distinct anonymized court orders.

3        Hence, to deter further bad acts by the twice State Bar disciplined counsel

4    Colton, at minimum an order to show cause should issue as to Colton's violation of the

5    referenced court orders.

6

7

8                                        **CONCLUSION**

9        Amicus Curiae's Request for Leave to File Amicus Brief is filed in good faith,

10   and intended to protect the proposed class, as well as jurisprudence in this matter.

11        Amici's further Requests for (1) an order to <u>seal and strike</u> Plaintiff Counsel

12   Colton's Jan. 28, 2019 blatantly improper pleading and declaration, as well as (2)

13   Request for sanctions, costs, and fees and (3) Request to hold Colton in Contempt  is

14   based on good showing and just cause and should be *granted* in conformity with the

15   laws of this Court.

16

17        DATE: February 10, 2019

18

19                                        Respectfully Submitted,

20                                        /S/ N. Alai

21                                        **N. Alai**

22

23

24

25

26

27   REPLY BRIEF IN FURTHER SUPPORT OF "REQUEST FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN
     OPPOSITION TO  ROLAND C. COLTON'S  APPLICATION FOR  LEAD  CLASS COUNSEL"

28

## DECLARATION OF NILI ALAI IN SUPPORT OF AMICUS BRIEF

1. I am not a party to this action and I file the herewith brief and declaration in good faith, and not for any improper purpose.

2. I am a medical doctor, duly licensed to practice medicine in the State of California. I am competent to testify to the contents of this declaration, and make the same based on my own knowledge.

3. I am aware of these facts based on my knowledge, and through admissions made by Roland Colton to me. I have known Colton in a personal and professional capacity for more than 10 years.

4. I was represented by lawyer Roland Colton as counsel of record, from about February 2015-June 2016 in Orange County Superior Court case No. 30-2012-00549174.

5. I _never_ waived my Attorney client privilege with Mr. Colton.

6. I _never_ waived court ordered anonymity in the referenced case of exceptional circumstances, nor have I ever authorized Mr. Colton to de-anonymize the same. In fact, on or about August 18, 2018 I specifically wrote Colton and his lawyers a detailed written correspondence with courtesy copies of the anonymized court orders, with an unambiguous demand to not violate the anonymized case, deemed of exceptional nature by the court. Hence it was extremely distressing to find out that Colton filed a blatant violation of those orders, and purposely de-anonymized a highly exceptional case in public federal court pleadings. Colton's conduct and bad faith act to de-anonymize a highly sensitive matter ordered by the court as of "exceptional circumstance", would thus be unjust and improper.

7. I have _never_ authorized Mr. Colton to release "our" email communications, or any other attorney client privilege documents, or information.

REPLY BRIEF IN FURTHER SUPPORT OF "REQUEST FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN OPPOSITION TO ROLAND C. COLTON'S APPLICATION FOR LEAD CLASS COUNSEL"

8. Attached hereto as Exhibit "A" is are true and correct copy of the letter which Colton sent demanding that the amicus brief be withdrawn, and deprive the court of the vital information.

9. Attached hereto as Exhibit "B" is are true and correct copy of Colton's DENIED ex parte dated Feb. 7, 2019 on his demand to withdraw the amicus brief from this Federal Court, and to issue a gag order as to remarks about his crimes and federal convictions.

10. Attached hereto as Exhibit "C" is are true and correct copy of the ex parte application to force withdrawal of this amicus brief which Colton filed in Superior court (Denied on Feb 7, 2019).

11. Attached hereto as Exhibit "D" is are true and correct copy of the letter which I sent to Colton in August 2018 warning as to the anonymized court orders.

12. I have incurred costs, filing fees, and attorney fees in excess of $1680 for filing this Reply brief, seeking legal counsel, and filing fees.

13. It remains my unequivocal opinion that Roland Colton is unfit as class counsel as to his most recent alleged State Bar Rules violations as to attorney client privilege, criminal convictions, habitual dishonesty, financial crimes, and career long moral turpitude, and that he should not be so appointed.

I declare under penalty of perjury, pursuant to the laws of the State of California, that the foregoing is true and correct.

DATE: February 10, 2019         /S/ N. Alai

                                Nili Alai

                                On Behalf of Amicus Curiae

## DECLARATION OF SAM NABILI

1. I am a medical doctor, duly licensed to practice medicine in the State of California. I am competent to testify to the contents of this declaration, and make the same based on my own knowledge.

2. I was represented by attorney Roland Colton as counsel of record, from about February 2015-June 2018 in Orange County Superior Court case No. 30-2012-00549174.

3. I am not a party to any action against Mr. Cotlon and I never waived my Attorney client privilege.

4. I have never authorized Mr. Cotlon to release "our" email communications, or any other attorney client privilege documents, or information.

5. Therefore, I was appalled to find out that Mr. Colton without my knowledge, prior authorization, or any consent, had released our emails and various confidential attorney client work product and communications in a completely unrelated matter entitled 2:17-cv-05872-DSF-KS *Brunilda Stephens v. Nordstrom, Inc. et al* in Central District of Federal Court.

6. On Jan. 28, 2019 Mr. Colton blatantly released approximately ten (10) of my emails, or those emails which I caused to be sent, or was carbon copied in my legal representation by Colton.

7. Mr. Colton's Jan. 28, 2019 filing entitled "*Declaration of Roland C. Colton in Support of Plaintiff' Objections and Opposition to Nili Alai's Request to File an Amicus Curiae Brief*" was a violation of my attorney client privilege.

8. At no time before or after Colton's 1/28/19 filing his Declaration under oath in federal court, did Colton ever call, email, or notify in any manner that he had released my emails, or in any way purport that he inadvertently released the same, or let me know of his disclosures.

9. As a result of Mr. Colton's blatant violation of my attorney client privilege and unauthorized release of my confidential documents, legal advice was obtained. Based on the aforementioned, it is thus my understanding that legal counsel has advised the following:

   - Colton violated Bus. and Professions Code § 6068 (e)(1): Client Confidentiality;
   - Colton violated State Bar Rules of Professional Conduct, Rule 3-100; and.
   - Colton violated public policy.

10. I never authorized Mr. Colton's dissemination of our email communications.   Thus, I respectfully request that Colton's referenced 1/28/2019 pleading should be stricken and sealed, and his unethical conduct before the court, sanctioned.

I declare under penalty of perjury, pursuant to the laws of the State of California, that the foregoing is true and correct.

DATE:  February 10, 2019  executed  at Orange County , California.

Siamak Nabili, M.D.

# EXHIBIT "A"

## Florence, David

| | |
|---|---|
| **From:** | Roland COLTON <rcc7@msn.com> |
| **Sent:** | Tuesday, February 05, 2019 6:57 PM |
| **To:** | Bertsche, Corinne; Florence, David; N. Alai |
| **Cc:** | Siamak Nabili |
| **Subject:** | [EXT] Re: SECOND REQUEST:  2:17-cv-05872-DSF-KS Brunilda Stephens v. Nordstrom, Inc. et al |
| **Attachments:** | Letter re ALAI 2-5-19 (signed).pdf |

External Email

Nili,

Your attention is directed to the attached letter, which responds to your emails of Feb. 1st and Feb. 4th.


Roland C. Colton
**COLTON LAW GROUP**
28202 Cabot Road
3rd Floor
Laguna Niguel, CA. 92677
Phone: (949) 365-5660
Fax: (949) 365-5662


**From:** N. Alai
**Sent:** Monday, February 4, 2019 7:47 PM
**To:** Roland Colton; Corinne Bertsche; David Florence
**Cc:** Siamak Nabili
**Subject:** SECOND REQUEST: Time Sensitive EX PARTE Re: Colton Court Order Violations 2:17-cv-05872-DSF-KS Brunilda Stephens v. Nordstrom, Inc. et al
**SECOND REQUEST**

Feb 4, 2019


Dear Counsel,

Kindly advise of your response to the Feb 1, 2019 correspondence.
We would expect that this matter maybe resolved between parties
and not require the courts' intervention.

Given that (1) Defendant Colton's court order violation was a full 5 months AFTER
he and his counsel were in good faith put on written notice of the court orders with courtesy copies of the
same, and
(2) therefore Colton and his counsel all knew or should have known of the orders;

1

it appears that Colton's willful acts in de-anonmyzing a court ordered anonymous case of exceptional circumstance
was in extremely bad faith, carried out for nefarious purpose and intent, and in violation of Rules of Court and State Bar Rules.

It is Plaintiff's position that counsel are equally charged with a duty to uphold
these court orders once made aware of them. Hence, you have and had knowledge of your client's actions.
I apologize because there is no tactful manner to say this, but it is well established that Mr. Colton is a criminal with multiple
State Bar public actions, but his current counsel should not have to be bound by his unlawful acts,
nor have to go down such a egregious path.

However, should there not be a written agreement of parties by the close of business Tuesday 2/5/19
and swift and reasonable proposed correction by Defendant Colton and his counsel to seal and thus mitigate his unlawful conduct,
we intend to file ex parte for a seal order, as well as monetary sanctions against
Defendant *and* counsel pursuant to Rule 2.30, as well as the Federal court corollaries.

Again, you are put on SECOND notice that Dr. Nabili never waived any privilege and he remains the holder of that privilege as well. Mr. Colton's violation is highly improper and should be corrected.

If Defendant agrees to immediately move to seal the referenced pleading, we would be agreeable to not seek an ex parte application and sanctions for this violation.

In regards to an award of sanctions and attorney fees to Plaintiff, please be reminded of *Mix v. Tumanjan Develop. Corp.* (2002) 102 CA4th 1318, 1324 as to the same for pro se or limited scope litigants without an attorney of record.

Thank you in advance for your anticipated cooperation.

Sincerely,
Ally


On Friday, February 1, 2019, 6:44:16 PM PST, N. Alai wrote:


Dear Counsel and Mr. Colton,

We received notice of your filing -docket entry #56 ( 1/28/19) this afternoon. This is the earliest notice possible to parties.

We were alerted to Mr. Colton and Mr. Eskanderi's unlawful filing in the case in Federal Court
2:17-cv-05872-DSF-KS Brunilda Stephens v. Nordstrom, Inc. et al. whereby you willfully did the following:

1. Violated Court Orders as to an anonymized matter;
2. Violated attorney client confidentiality of Sam Nabili through dissemination of his emails without authorization or release;
3. Violated attorney client confidentiality of Nili Alai through dissemination of her emails without authorization;
4. Violated Business and Professions Code 6068 (e)(1);
5. Violated Former State Bar Rule 3-100(A);
6. Violated attorney requirement for candor to tribunal with false dates (Decl. Colton ¶11); and
7. Falsification of facts. Decl. Colton ¶ 24 "historical novel" whereas in truth was referenced correctly as "romance novel" .


**Please see the attached correspondence and Exhibits (Court orders) served to you on August 12, 2018.**
Therefore, when on 1/28/19 you violated the court orders, you knew or should have known of the orders.
Moreover, as you represented the anonymized parties in that action in 2015 and 2016, you also knew and

2

should have known of the anonymous nature of an exceptional nature as ruled by the court. We have **not** included co-counsel Eskanderi here as the 8/12/18 letter most importantly references the anonymized court orders, as well as attorney client privilege which parties have not and will not waive.

By nature of the referenced Orders, your mere publication and de-anonymization of the parties in the ordered exceptional matter is also a violation of the Orders. Moreover, Colton certainly could be argued has implicated his own attorneys and co-counsel as well, referenced *infra. We* will also reiterate that neither *Dr. Nabili nor Dr. Alai have ever released or waived privilege, and certainly not their emails. Dr. Nabili has no active litigation thus Mr. Cotlon clearly should know he has no right to violate Dr. Nabili's attorney client privilege, which Colton has certainly done. (Decl. Colton¶25 and Exh. C)*

**Mr. Colton, your habitual conduct is not only dirty, shameful and in bad faith, it is certainly unlawful-as you as a convicted felon well should know.**
As you and your attorneys were notified vis-a-vis the clearly outlined 6 page correspondence dated 8/12/18 , any de-anonymization of the referenced matter (and Order) is not only improper, but also sanctionable conduct for an attorney, and further actionable.

**Accordingly, we assume that you are agreeable to (1) urgently file a motion to seal your referenced pleadings, (2) mitigate the inadvertent further release of the same in 2:17-cv-05872-DSF-KS Brunilda Stephens v. Nordstrom, Inc. et al, or any other matters which you have done the same.**

As further relevant history, on January 30, 2019 Ms. Bertsche and Mr. Florence on behalf of Defendant Roland C. Colton wrote a demand to "withdraw" the Amicus Curiae brief filed in the Nordstrom matter. As a statement of facts, the Brief was simply an abbreviated factual account of Mr. Cotlon's criminal enterprises as documented through his grand jury indictments, federal felony conviction, and federal misdemeanor plea bargain cases, among others. These are simple truths, facts, and declarations made by Colton which the Court should know about. Contrary to Mr. Colton's recent pleading, these are not *ad hominem* attacks which apparently Colton has now despicably made. Hence, counsel's baseless demand to silence speech appears without any constitutional or statutory support. Hence, in absence of any such provided basis, the undersigned will **neither cease nor desist.**

Unless we receive written confirmation of your agreement *and* a conformed copy of such a motion to seal by the close of business on Monday Feb 4, 2019, it will be assumed that you refuse to correct the references unlawful conduct.

Accordingly we will be forced to (1) take proper remedial action, (2) prepare filings with each affected court, and (3) forward formal grievances with exhibits of Mr. Colton's filing and declaration in his "class action" as to all involved parties to administrative agencies.

Very Truly Yours,
Nili Alai

# ROLAND C. COLTON

February 5, 2019

*VIA EMAIL (nnalai@yahoo.com)*

Nili Alai
14 Monarch Bay Plaza
Suite 383
Dana Point, CA. 92629

Case:   *Your Amicus Curiae Brief and Responsive Pleadings Thereto*

Dear Ms. Alai:

This letter responds to your emails of February 1 and 4, 2019 regarding your claim of anonymity in connection with your Santa Clara lawsuit and your contention that Mr. Siamik's rights have been abridged by the response to your Amicus Curiae Brief, filed in the *Stephens v. Nordstrom* matter.

I will remind you that it was your submittal of the libelous and defamatory Amicus Curiae Brief that triggered the need for my myself and my firm to defend itself and respond to your vicious and contemptible attacks. Your repeated characterization of me as a "criminal" who has "committed financial crimes and habitual frauds," who has engaged in "general moral turpitude and repeated acts of dishonesty," along with baseless and manufactured lies contained therein, constitutes *libel per se* under California law. (*See* 5 Witkin, Summary of Cal. Law (10ᵗʰ ed. 2005) Torts, §542, p. 795; *Boyich v. Howell* (1963) 221 Cal. App. 2ⁿᵈ 801; *Christian Research Institute v. Alnor* (2007) 148 Cal. App. 4ᵗʰ 71, 80.) Consequently, at the appropriate time, I will be seeking compensatory and punitive damages from you for not just the Amicus Curiae Brief but other defamatory and libelous statements you have published to third parties. [*See* CACI 1704 which permits an award of punitive damages for defamation *per se*.]

Your defamatory actions are particularly egregious in light of your own previous recognition that I had "won high standing and praise of trial judges and legal adversaries..." and your own comments that I "was a highly competent attorney and experienced professional with nearly 40 years under your belt (who has been) astute in understanding the extreme defense tactics, the massive cover-up, and forced disconnects with our legal team through some expert and deft defense maneuvers for the same." You also noted with glowing praise and appreciation that I had "enthusiastically assumed representation of (your) nearly insurmountable case mid-game." (*See* your August 7, 2015.)

28202 Cabot Road, Suite 300, Laguna Niguel, CA. 92677 * Phone (949) 365-5660

# EXHIBIT "B"

## Colton Court Order Violations 2:17-cv-05872-DSF-KS Brunilda Stephens v. Nordstrom, Inc. et al

From: N. Alai (nnalai@yahoo.com)

To:   rcc7@msn.com; corinne.bertsche@lewisbrisbois.com; david.florence@lewisbrisbois.com

Cc:   nnalai@yahoo.com; snabili@yahoo.com

Date: Friday, February 1, 2019, 6:44 PM PST


Dear Counsel and Mr. Colton,

We received notice of your filing -docket entry #56  ( 1/28/19) this afternoon. This is the earliest notice possible to parties.

We were alerted to Mr. Colton and Mr. Eskanderi's unlawful filing in the case in Federal Court 2:17-cv-05872-DSF-KS Brunilda Stephens v. Nordstrom, Inc. et al. whereby you willfully did the following:

1. Violated Court Orders as to an anonymized matter;
2. Violated attorney client confidentiality of Sam Nabili through dissemination of his emails without authorization or release;
3. Violated attorney client confidentiality of Nili Alai through dissemination of her emails without authorization;
4. Violated Business and Professions Code 6068 (e)(1);
5. Violated Former State Bar Rule 3-100(A);
6. Violated attorney requirement for candor to tribunal  with false dates (Decl. Colton ¶11); and
7. Falsification of facts: Decl. Colton ¶ 24 "historical novel" whereas in truth was referenced correctly  as "romance novel" .

**Please see the attached correspondence and Exhibits (Court orders) served to you on August 12, 2018.**
Therefore, when on 1/28/19 you violated the court orders, you knew or should have known of the orders. Moreover, as you represented the anonymized parties in that action in 2015 and 2016, you also knew and should have known of the anonymous nature of an exceptional nature as ruled by the court. We have **not** included co-counsel Eskanderi here as the 8/12/18 letter most importantly references the anonymized court orders, as well as attorney client privilege which parties have not and will not waive.

By nature of the referenced Orders, your mere publication and de-anonymization  of the parties in the ordered exceptional matter is also a violation of the Orders. Moreover, Colton certainly could be argued has implicated his own attorneys and co-counsel as well, referenced infra.We will also reiterate that neither Dr. Nabili nor Dr. Alai have ever released or waived privilege, and certainly not their emails. Dr. Nabili has no active litigation thus Mr. Cotlon clearly should know he has no right to violate Dr. Nabili's attorney client privilege, which Colton has certainly done. (Decl. Colton¶25 and  Exh. C)

**Mr. Colton, your habitual conduct is not only dirty, shameful and in bad faith, it is certainly unlawful- as you as a convicted felon well should know.**

As you and your attorneys were notified vis-a-vis the clearly outlined 6 page correspondence dated 8/12/18 , any de-anonymization of the referenced matter (and Order) is not only improper,  but also sanctionable conduct for an attorney, and further actionable.

**Accordingly, we assume that you are agreeable to (1) urgently file a motion to seal your referenced pleadings, (2) mitigate the inadvertent further release of the same in 2:17-cv-05872-DSF-KS Brunilda Stephens v. Nordstrom, Inc. et al, or any other matters which you have done the same.**

As further relevant history, on January 30, 2019 Ms. Bertsche and Mr. Florence on behalf of Defendant Roland C. Colton wrote a demand to "withdraw" the Amicus Curiae brief filed in the Nordstrom matter. As a

statement of facts, the Brief was simply an <u>abbreviated</u> factual account of Mr. Cotlon's criminal enterprises as documented through his grand jury indictments, federal felony conviction, and federal misdemeanor plea bargain cases, among others. These are simple truths, facts, and declarations made by Colton which the Court should know about. Contrary to Mr. Colton's recent pleading, these are <u>not</u> *ad hominem* attacks which apparently Colton has now despicably made. Hence, counsel's baseless  demand to silence speech appears without any constitutional or statutory support. Hence, in absence of any such provided basis, the undersigned will **neither cease nor desist.**

Unless we receive written confirmation of your agreement *and* a conformed copy of such a motion to seal by the close of business on Monday Feb 4, 2019, it will be assumed that you refuse to correct the references unlawful conduct.

Accordingly we will be forced to (1) take proper remedial action, (2) prepare filings with each affected court, and (3) forward formal grievances with exhibits of Mr. Colton's filing and declaration in his "class action" as to all involved parties to administrative agencies.

Very Truly Yours,
Nili Alai


 18-8-12 LTTR to COLTON cousnel HIGHLIGHTED as to DOE case re SAC and court orders ROLAND VIOLATION.pdf
865.7kB

 19-1-28 ROLAND DECLARATION OPP violated court order 031129844998 HIGHLIGHTED.pdf
468kB

# EXHIBIT "C"

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
CORINNE C. BERTSCHE, SB# 174939
2 | E-Mail: Corinne.Bertsche@lewisbrisbois.com
DAVID M. FLORENCE, SB# 242857
3 | E-Mail: David.Florence@lewisbrisbois.com
701 B Street, Suite 1900
4 | San Diego, California 92101
Telephone: 619.233.1006
5 | Facsimile: 619.233.8627

6 | Attorneys for Defendant ROLAND C. COLTON
dba COLTON LAW GROUP

7

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**02/06/2019** at 01:50:00 PM

Clerk of the Superior Court
By Alan Silva, Deputy Clerk

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11 | NILI ALAI, | CASE NO. 30-2017-00915715-CU-PN-CJC

12 | Plaintiff, | **DEFENDANT ROLAND C. COLTON DBA COLTON LAW GROUP'S** *EX PARTE*

13 | vs. | **APPLICATION FOR A PROTECTIVE ORDER, OR IN THE ALTERNATIVE, AN**

14 | ROLAND COLTON, An Individual practicing as COLTON LAW GROUP, a fictitious | **ORDER SHORTENING TIME FOR A MOTION FOR A PROTECTIVE ORDER;**

15 | business name, otherwise form unknown; JAMES EDWIN POLLOCK, an individual; | **MEMORANDUM OF POINTS AND AUTHORITIES**

16 | DANIEL HODES, an individual, also known as DANIEL M. HODES; JASON CARUSO, |

17 | an individual, also known as JASON MOBERLY CARUSO; JEFFREY MILMAN, | **Date: February 7, 2019**
**Time: 1:30 p.m.**

18 | an individual, also known as JEFFREY A. MILMAN; KEVIN G. LIEBECK, an | **Judge: Hon. Ronald L. Bauer**
**Dept.: CX103**

19 | individual; HODES, MILMAN & LIEBECK, LLP, a business corporation also known as | Action Filed: 4/19/2017

20 | HODES MILMAN LLP; AND DOES 4-50 Inclusive, | Trial Date: 9/30/2019

21 | Defendants.

22

23 | TO ALL PARTIES AND THEIR ATTORNEY'S OF RECORD:

24 | NOTICE IS HEREBY GIVEN that on <u>**February 7, 2019**</u> at <u>**1:30 p.m.**</u>, or as soon

25 | thereafter as counsel may be heard, in Department CX103 of the Orange County Superior Court,

26 | Civil Complex Center, located at 751 West Santa Ana Boulevard, Santa Ana, California 92701,

27 | Defendant ROLAND C. COLTON dba COLTON LAW GROUP, erroneously named as Roland

28 | Colton, An Individual practicing as Colton Law Group, a fictitious business name, otherwise form

4810-8743-6423.1

1

DEFENDANT COLTON'S *EX PARTE* APPLICATION FOR A PROTECTIVE ORDER

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
ATTORNEYS AT LAW

1   unknown ("Colton") will appear *ex parte* for an order in this case precluding Plaintiff Nili Alai

2   ("Plaintiff") from contacting Colton's clients, filing documents in his cases where she is not a

3   party and has no interest, contacting Colton or his wife regarding this legal malpractice action, and

4   requiring Plaintiff to withdraw her amicus brief filed in Colton's unrelated federal action.

5   Alternatively, Colton requests an order shortening time for a motion for a protective order.

6        This application is made pursuant to Code of Civil Procedure section 128 and California

7   Rules of Court, rules 3.1200, *et seq.* governing *ex parte* applications.

8        Good cause exists for the requested relief.  Plaintiff has interfered with Colton's practice

9   and representation of clients by searching for cases where he is counsel and inserting herself into

10  said action.  This includes filing an amicus brief in a federal court action pending in Central

11  District of California, falsely asserting that Colton is unfit and a criminal to request that he not be

12  appointed class counsel, despite that she is not a party and has no interest in that litigation.

13  Plaintiff has threatened to sue Colton's wife for allegedly "misrepresenting" that Colton was a

14  spectacular attorney, and has sent emails to both Colton and his wife in this case despite requests

15  to stop.  She has filed state bar complaints against not only Colton, but also defense counsel in the

16  underlying Shang litigation, as well as sanctions motions, and now threatens sanctions against

17  defense counsel in this litigation, attorneys Corinne Bertsche and David Florence.  Plaintiff's

18  actions and threatened actions are plainly improper, harassing and must cease immediately.

19  Intervention by this Court is necessary and time is of the essence.

20       This *ex parte* application is based upon this notice of application, the memorandum of

21  points and authorities in support, the declaration of David M. Florence in support, the entire court

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-8743-6423.1
2
DEFENDANT COLTON'S *EX PARTE* APPLICATION FOR A PROTECTIVE ORDER

1 | file in this matter, and upon such other and further oral and documentary evidence as may be

2 | presented at or before the hearing on this ex parte application.

3 |

4 | DATED: February 6, 2019        LEWIS BRISBOIS BISGAARD & SMITH LLP

5 |

6 |       By: *David M Florence*

7 |          Corinne C. Bertsche
         David M. Florence

8 |          Attorneys for Defendant ROLAND COLTON, dba
         COLTON LAW GROUP

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-8743-6423.1

3

DEFENDANT COLTON'S *EX PARTE* APPLICATION FOR A PROTECTIVE ORDER

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND STATEMENT OF FACTS

Colton respectfully requests an order in this case precluding Plaintiff from contacting Colton's clients, filing documents in his cases where she is not a party and has no interest, contacting Colton or his wife regarding this legal malpractice action, and requiring Plaintiff to withdraw her amicus brief filed in Colton's unrelated federal action where he has applied to act as lead class counsel.

### A.  The Underlying Medical Malpractice Action

This action arises from defendants' representation of plaintiff, Nili Alai, M.D. ("Plaintiff") in pursuit of her medical malpractice action against her ophthalmologist, Dr. Barbara Ya-Hui Shang for personal injuries she claimed to have suffered as a result of contracting the Epidemic keratoconjunctivitis ("EKC") virus after being treated by Dr. Shang.  Plaintiff had multiple attorneys representing her at various times throughout the underlying action.  Colton was the last in a long line of attorneys, and represented Plaintiff through trial.[1]

Plaintiff repeatedly failed to cooperate and engaged in abuses to the discovery process throughout the underlying action, including violating several court orders prior to Colton's representation.  Specifically, Plaintiff was sanctioned by the trial court for repeatedly contacting Dr. Shang's patients and other willful discovery abuses in violation of court orders precluding her from doing so.  (Exhibits A to Florence Decl. – 3/25/16 Minute Order from underlying action.)  Her egregious conduct included fabricating an EKC Foundation and mailing packages to Dr. Shang's patients to obtain their medical information under false pretenses.  (*See* Exhibit A, B, and C to Florence Decl. – 3/25/16, 10/31/14, and 12/1/14 Minute Orders from underlying action.)  Plaintiff also engaged in other discovery abuses, including failing to provide key witness information necessary to dispute her claims.  Plaintiff's discovery abuses and violations led to the

---

[1] Plaintiff had been represented by five different attorneys during the underlying action, and also acted *in pro per* during various times.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-8743-6423.1

4

DEFENDANT COLTON'S *EX PARTE* APPLICATION FOR A PROTECTIVE ORDER

# EXHIBIT "D"

**N. Alai**
**14 Monarch Bay Plaza Suite 383**
**Dana Point, CA 92629**

August 12, 2018

Corinne C. Bertsche, Esq.
David M. Florence, Esq.
**Lewis Brisbois**
701 B Street, Suite 1900,
San Diego, CA 92101
T: 619.685.5507
F: 619.233.8627
Corinne.Bertsche@lewisbrisbois.com
David.Florence@lewisbrisbois.com
Janet.Smith@lewisbrisbois.com

(EXPEDITED FOR DELIVERY- NOT PROOFED)

James Edwin  Pollock, SBN # 44320
51 Dead Horse Loop,
Alton, UT 84710
Phone: (801) 520-5635
pollockje@gmail.com
PO Box 100771
Alton, UT 84710-0771

<u>**VIA EMAIL & U.S. MAIL**</u>

Re:      *Nili Alai v. Roland Colton, et al.*
             Insured: Colton Law Group and Roland C. Colton
             Orange County Superior Court Case No.: 30-2017-00915715-CU-PN-CJC

Dear David, Corrine, and Counsel for Defendants Mr. Colton ("Colton Law Group")  and
Mr. Pollock,

        Thank you for your outreach last week  and it was a pleasure connecting with
David telephonically last Friday. To memorialize my conversation with David on August
10, 2018, kindly find the following communication.
        We reviewed briefly the parties' dispute regarding the causes of action listed in
the SAC. With respect to Defendant's position that the SAC is defective for lacking the
Colton fee agreement in full, the complete agreement is attached to the lodged exhibit to

Insured: Colton Law Group and Roland C. Colton
Orange County Superior Court Case No.: 30-2017-00915715-CU-PN-CJC
Plaintiff's Correspondence on SAC and Notice of Court Orders

Page | 1

the State Bar Act, in addition to breach of contract, and subject to civil remedies.

Retainer Colton: Engagement and Fee Agreement (page four) ¶ 7(d) states "the Firm shall refund the $75,000 fixed fee payment referred to in paragraph 1a, above, less any costs that have been expended by the Firm in connection with this engagement within ten (10) days of withdrawal.

Since Defendant has refused to return the unearned funds, Plaintiff again makes a demand for Defendant to immediately return to Plaintiff these funds. In sum, Defendant has not only willfully failed to perform pursuant to contract, but he has egregiously refused to return Plaintiff's funds.

## DEMAND TO DEFENDANT TO MITIGATE COLLECTED FEES IN OTHER ACTIONS

Defendant Colton began representation of Plaintiff in a separate anonymized case in November 2015 without an advance fee agreement in violation of B&P Code §§ 6146 and 6148. Defendant then generated a surreptitious invoice for more than $2500 for his services which Plaintiff paid under check #24881. *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072 (*Aguilar*), holding as a matter of law that *an attorney violating an ethical obligation is not entitled to fees* (*id.* at p. 1079) Plaintiff makes a demand on Defendant to return those funds.

## NOTICE OF THREE COURT ORDERS ON ANONYMIZED CASE FILED HERETO " IN-CAMERA" AND "UNDER-SEAL"

Defendant specifically de-anonymized a case to named Plaintiffs, a case which pursuant to multiple Court orders is prohibited from such willful de-anonymization.

Defendants and their counsel are herewith put on notice of at least three court orders, as now relevant to Defendants' conduct in this litigation. These Court orders are not for public court filing within this action, and if need to be used, must be used judiciously as *under seal or in-camera*.

Counsel is in good faith cautioned that the mere publication of these orders within this action and hence deanonymization of either of the Plaintiffs in the referenced action, whether intentional or negligent, would likely result in prosecution by the ordering court and applicable administrative bodies pursuant to Bus. and Profess. Code § 6103.

## PLAINTIFF'S DEMAND FOR DEFENDANT TO MITIGATE WRONGFUL PRIOR DE-ANONYMIZATION DISCLOSURES IN *ALAI VS. SHANG*

For example, Defendant has knowingly violated an anonymized case which was court ordered as "exceptional circumstances" warranting the same. Defendant filed a MIL in April 2016 which willfully deanonymized a court ordered anonymous pleading. Defendant's willful and possible negligent violation of the referenced Court orders resulted in damages and adverse outcomes to Plaintiff. On other dates during his representation, Defendant further willfully de-anonymized a court ordered Doe case and listed the Doe party by full name in violation of multiple Court orders.

---

Insured: Colton Law Group and Roland C. Colton
Orange County Superior Court Case No.: 30-2017-00915715-CU-PN-CJC
Plaintiff's Correspondence on SAC and Notice of Court Orders

Defendant has at best, violated a fundamental principle in jurisprudence and the client-lawyer relationship, that, in the absence of the client's informed consent, a member must not reveal information *relating to the representation*. (See, e.g., *Commercial Standard Title Co. v. Superior Court* (1979) 92 Cal.App.3d 934, 945 [155 Cal.Rptr.393].) Here, Defendant has willfully violated the State Bar Act, and violated Public Policy. Should Defendant's conduct continue through this action, which would be highly unlikely, sanctions may be sought and would be warranted. (*Abandonato v. Coldren* (1995) 41 Cal. App. 4th 264)

### DEFENDANTS ARE STATUTORILY BARRED FROM DISCLOSURE OF CONFIDENTIAL ATTORNEY-CLIENT INFORMATION

Plaintiff, an attorney for Defendants cannot disclose any confidential information obtained in the representation of his clients without client's informed consent. (See Business and Professions Code section 6068(e)(1) and rule 3-100(A).) While in most situations, the identity of a client is not considered confidential and in such circumstances Attorney may disclose the fact of the representation to "Prospective Client without Witness Client's consent. Los Angeles County Bar Association Formal Opn. Nos. 456, 374.7/", *the case of an anonymized Doe filing and court orders ordering the same do not fall under this heading.*

Rule 3-100 "Confidential Information of a Client" cites " (A) A member shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the informed consent of the client, or as provided in paragraph (B) of this rule.".

[1] *Duty of confidentiality.* Paragraph (A) relates to a member's obligations under Business and Professions Code section 6068, subdivision (e)(1), which provides it is a duty of a member: "To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." A member's duty to preserve the confidentiality of client information involves public policies of paramount importance. (*In Re Jordan* (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371].) Preserving the confidentiality of client information contributes to the trust that is the hallmark of the client-lawyer relationship.

### FURTHER DE-ANONYMIZATION OF REFERENCED CASE BY DEFENDANT (OR HIS REPRESENTATIVES) WOULD VIOLATE COURT ORDERS

Defendants and their counsel, agents, or representatives know or should know of the Court orders governing the anonymized matter. Defendants are therefore again cautioned that the mere publication of these court orders within this action and hence deanonymization of either of the Plaintiffs in the referenced action, whether intentional or negligent, would likely result in prosecution pursuant to Bus. and Profess. Code § 6103.

### CLARIFICATION OF NON-REPRESENTATION BY DEFENDANT

Defendants Colton, Colton Law Group, and Mr. Pollock are no longer attorney for either of the Plaintiffs in the base action *Alai vs. Shang*. Defendants' former representation for Plaintiff on all cases has ceased. However, Plaintiff has not and does not intend to waive

---

Insured: Colton Law Group and Roland C. Colton
Orange County Superior Court Case No.: 30-2017-00915715-CU-PN-CJC
Plaintiff's Correspondence on SAC and Notice of Court Orders

privilege, work-product, or attorney-client privilege. Hence, Defendant is cautioned to tailor released documents within this action and to seal those documents, communications, or invoices which would violate privilege.

Pursuant to Rule 3-100, Defendant (an attorney) is subject to discipline for revealing confidential information which was strictly prohibited by Bus. And Profess. Code 6068 (e) (2). Plaintiff is the holder of the privilege and does not waive privilege with respect to Defendants. Defendant is therefore cautioned to make good faith attempts to preserve or balance client confidentiality and filing his pleadings in this action.. Rule 3-100 is not intended to augment, diminish, or preclude reliance upon, any other exceptions to the duty to preserve the confidentiality of client information recognized under California law. (Added by order of the Supreme Court, operative July 1, 2004.)

## PLAINTIFF'S UNDERLYING CASES ARE LIVE WITH TRIAL AND UPCOMING HEARINGS ON CALENDAR

Plaintiff has several matters that remain pending before the Courts, several of which involve representation by Defendants in this action. For example, one pending matter has a hearing on August 30, 2018 and a second action is pending trial on March 9, 2019.

Further dissemination and violation of client confidences by Defendants that are not narrowly tailored to this litigation would be likely prejudicial and possibly detrimental, and will force Plaintiff to seek through motions before this Court to justly restrain such willful or unintended conduct.

## CONCLUSION

Plaintiff is agreeable to meet and confer with Defendants on the causes of action in the SAC, and in good-faith remains open to further conferring on eliminating one or more COA as described herein. Plaintiff has made a demand on Defendants to remit the unearned fee retainer which Defendant has converted since April 20, 2016. Pursuant to Defendant's own contract, ¶7(d), Defendant was required to refund Plaintiff within 10 days of Defendant's withdrawal, which he failed and flat refused to do.

Notwithstanding ongoing meet and confer efforts, Plaintiff disputes the characterization by Defendant that the SAC has irrelevant or improper allegations, or paragraphs and images. First, the truth is an absolute defense to such misguided claims by Defendant. Moreover, each and every paragraph in the SAC is fully substantiated, factually based, and highly relevant to this action as explained herein. Hence, in absence of an agreement of parties to resolve one or more of the COA, Plaintiff is unable to remove the otherwise relevant paragraphs in the SAC.

Please feel free to contact me for any comments or questions. Kindly advise if you will be accepting service on behalf of Mr. Colton's purported group associate, Mr. Pollock.

Thank you for your anticipated cooperation with the referenced Court orders.

Very truly Yours,

N. Alai

Insured: Colton Law Group and Roland C. Colton
Orange County Superior Court Case No.: 30-2017-00915715-CU-PN-CJC
Plaintiff's Correspondence on SAC and Notice of Court Orders

# DOCUMENTS DESIGNATED CONFIDENTIAL AND

# UNDER SEAL

## PURSUANT TO COURT ORDER

## NO FURTHER ORDER REQUIRED

**REFERENCED COURT ORDERS AS TO AN ANONMYZED MATTER OF EXCEPTIONAL CIRCUMSTANCE , AND COURT ORDERED AS SO WILL BE MADE AVAILABLE TO THE COURT IN CAMERA AT ORAL HEARING. THEIR MERE PUBLICATION WOULD THUS VIOLATED THE REFERENCED ANONYMIZED ORDERS.**

# EXHIBIT  "E "
# DECLARATION OF
# ROLAND C. COLTON
# IN HIS  CRIMINAL
# TRIAL

## AFFIDAVIT OF ROLAND C. COLTON

1

2

3      I, Roland C. Colton, declare as follows:

4      1.      I am the defendant named in the within indictment.  I have personal

5  knowledge of the facts set forth in this declaration and, if called and sworn as a witness, I

6  would be competent to testify to such facts.

7      2.      I have been an attorney licensed to practice law in the State of California

8  since June 28, 1978.  I operated as a sole practitioner for many years before forming the

9  law partnership of Colton & Roesser in 1991.  My practice was based in San Diego

10  County until 2005, when I moved my offices to Orange County.  I married my present

11  wife, Dr. Nahid Birjandi ("Dr. Birjandi"), on June 18, 1999, and have resided with her

12  since that time in her Laguna Niguel residence.

13      3.      On October 11, 2001, I filed Chapter 7 bankruptcy in the Southern District

14  of California.  The Trustee appointed to the case was Richard Kipperman ("Trustee"),

15  represented by the law firm of Pyle, Sims, Duncan & Stevenson.

16      4.      On December 11, 2001, the Trustee's counsel sent me a letter demanding

17  that the law firm of Colton & Roesser be dissolved, that all assets of the partnership be

18  sold, and that any surplus be paid over to the Trustee.  In December, 2001, the Trustee's

19  counsel also sent me a letter seeking to terminate the lease where the law firm was

20  conducting business in Del Mar, California.

21      5.      The first session of my Rule 2004 bankruptcy examination took place one

22  month later, on January 15, 2002.  During this examination, I answered questions about

23  my finances, my wife's finances, and financial payments that I had made to my wife to

24  assist her in making mortgage payments on her residence.  During the deposition, the

25  Trustee's attorney, Peter Duncan, indicated to me and my counsel, "off the record", that

26  the Trustee might take legal action against my wife, in view of testimony that I had

27  provided her financial assistance.  I then advised Mr. Duncan that I had not notified my

28  wife of my bankruptcy, and requested that I be given notice before any legal action was

1   taken against my wife so that I could discuss it with her first to minimize the shock and

2   embarrassment to her and her family and the potential disruption to my marriage that was

3   likely to result; Mr. Duncan gave his word to me and my attorney that he would do so.

4       6.      Shortly thereafter, on January 30, 2002, *without any advance notice*, the

5   Trustee filed a lawsuit against my wife, Dr. Birjandi, seeking to force the sale of her

6   residence and pay over the proceeds to the Trustee. A *lis pendens* was also recorded

7   simultaneously against my wife's Orange County residence. The lawsuit also sought to

8   force the turnover of Dr. Birjandi's podiatric practice, a practice to which, as I had

9   testified, I had never given any financial support. The lawsuit and *lis pendens* were

10   served on my wife's parents (temporary guests at the residence), who then shared the

11   documents with my wife. She was in hysterics when she confronted me with the legal

12   action. To add to the stress, my wife and I had discovered only days earlier that she was

13   pregnant with our first child.

14       7.      Mr. Duncan later tried to justify his action by explaining that my wife had

15   dual citizenship and might flee the jurisdiction. Mr. Duncan's actions resulted in a

16   complete breakdown of trust between myself and the Trustee, greatly escalating the

17   acrimonious litigation between the parties. His unethical behavior continued as he

18   violated bankruptcy rules and protective orders entered into in my case.

19       8.      As hostilities increased, counsel for the Trustee  threatened to file lawsuits

20   against my adult children – Jessica (age 26), Kimberly (age 24), Michael (age 21) and

21   Christopher (age 19) –  for whom I had provided post-high school financial assistance

22   with respect to tuition, housing and support payments during prior years. At the same

23   time, the Trustee also threatened litigation against my law partner and law firm.

24       9.      Faced with staggering legal fees in defending the bankruptcy litigation and

25   adversary proceedings, along with the prospects of future legal action against my

26   children, my law partner and law firm, my attorney suggested moving for dismissal of the

27   bankruptcy petition. It was clear that I would never be able to obtain the fresh start that I

28   had sought, and that the personal and financial cost of litigating multi-front actions with

1   the Trustee had become extremely burdensome, threatening my marriage, my children,

2   and my business relationships.

3         10.    In the midst of mounting litigation, my attorney approached the Trustee

4   about stipulating to a dismissal of my bankruptcy petition, wherein I would receive no

5   discharge of my debts.  The Trustee responded in writing, on May 21, 2002, stating that

6   if I paid a $500,000 penalty and stipulated to a denial of discharge, that the Trustee would

7   agree to the stipulation.  I rejected the offer.

8         11.    Rebuffed by my rejection of the penalty payment, the Trustee raised the

9   stakes even higher.  On June 14, 2002, making good on his threat, the Trustee filed an

10  adversary action against my law partner and my law firm, attempting to force the law

11  firm's dissolution and to recover from my partner one-half of all draws that had been paid

12  to me since the filing of the petition, and seeking a termination of the partnership's lease.

13        12.    On July 1, 2002, I filed a motion to dismiss his bankruptcy petition.

14  Although the Trustee previously had been willing to stipulate to a dismissal (upon

15  payment of a substantial penalty), the Trustee now vigorously opposed the motion, and

16  the motion was denied.  The Trustee then went into full throttle against me and other

17  parties in the various adversary proceedings.

18        13.    During the pendency of the bankruptcy, with the assistance of counsel, I

19  was preparing amendments to my bankruptcy schedules to address any potential

20  omissions and inaccuracies contained therein.  The process of completing the

21  amendments was frequently diverted due to the constant barrage of motions, subpoenas

22  and other discovery matters coming from the Trustee that had to be responded to.  In

23  addition, my time was further compromised by the birth of my daughter on October 10,

24  2002.  But for the onset of settlement discussions less than two weeks later, the

25  amendments would have been completed, and would have addressed the allegations

26  contained within the September 30, 2002 motion discussed below.

27        14.    On September 30, 2002, the Trustee filed an *ex parte* motion for a

28  temporary injunction (without notice), alleging that I had concealed assets and business

1   interests (including certain property located in France).   At the unopposed *ex parte*

2   hearing on October 15, 2002, the court granted the TRO.  On October 17, 2002, my

3   attorney and I were served with a copy of the motion and TRO, indicating a preliminary

4   injunction hearing set for October 25, 2002—just eight days later.

5       15.    On October 22, 2002, my attorney advised me that he had been told by

6   counsel for the Trustee, Susan Stevenson, that I "had better settle the case quickly if I

7   wanted to avoid future criminal action."  I perceived the comment to be borderline

8   extortion and asked Mr. Curry to note the conversation in my file.  I took very seriously

9   the implications of having to defend not only the multi-front civil litigation, but also

10   criminal proceedings in the future.

11      16.    Mr. Curry advised me that it would be in my best interests to settle the case

12   quickly in order to avoid criminal action.  As a result, settlement discussions ensued

13   rapidly.  During the course of the discussions, Mr. Curry made efforts to move the

14   discussions along as quickly as possible, at times telling me that I might be sacrificing

15   certain benefits by doing so.  For example, he believed that we could have negotiated a

16   lower financial obligation with the Trustee, given some additional time.  Foremost in my

17   mind was that we meet the Trustee's demand of reaching a prompt settlement before

18   criminal action was commenced.

19      17.    Forsaking the prior $500,000 penalty offer, the Trustee felt he had leverage

20   to ask for much more than before.  Over the course of the next few days, I ultimately

21   committed to paying the Trustee a penalty of up to $1,150,000,[1] plus agreed to pay an

22   additional $1,000,000 penalty in the event that I defaulted on the settlement agreement.

23   The Trustee also insisted that I not receive a discharge as part of the settlement.  Under no

24   circumstances would I have agreed to such excessive financial penalty and forfeited my

25   right to a discharge of debts, if I had not understood that the settlement wrapped up all

26

27   _____

28      [1] I call the $1,150,000 figure a penalty because only a small fraction of the money would be
used to pay creditors.  The lion's share of the money was to be paid to the Trustee, his attorneys and
experts, thus resulting in a minimal pay-down of debt with no discharge of bankruptcy.

1    aspects of my case, including any potential criminal action.

2        18.    In negotiating and drafting the settlement agreements, Mr. Curry advised

3    me on several occasions that he was taking care to include language as strong as possible

4    to make it clear that the settlement would encompass any potential criminal action as

5    well.

6        19.    Mr. Curry also told me that, since the threat of criminal action was gone

7    with the settlement, there would be no need to file any opposition or reply papers to the

8    Motion.  He further indicated to me that there would be no need to complete the

9    amendments to my bankruptcy schedules.

10       20.    I also had discussions with my wife about moving quickly on the

11   settlement.  With our newborn child less than two weeks old, I reluctantly shared with my

12   wife the veiled threat of criminal action if I did not act quickly to settle the case.  My wife

13   was horrified about this possibility and told me that I needed to do whatever it took to

14   resolve the bankruptcy case immediately.

15       21.    My wife told me that if we were assured that there would be no criminal

16   action taken against me that she would assist me financially with the settlement.  As a

17   result, she agreed to refinance her residence and allowed approximately $280,000 of the

18   refinance funds to be used to pay the Trustee in connection with my settlement.

19       22.    Despite that the settlement involved a huge financial toll for my family, my

20   wife and I attempted to put the past behind us and get on with our lives.  Convinced that

21   there would not be a criminal action, we decided to have another child.  A second

22   daughter was born to us on March 8, 2005.  Neither my wife nor I would have considered

23   bringing another child into the world if we had believed that I would be facing an

24   indictment with a risk of years of imprisonment.  I was particularly sensitive to the

25   anxiety and panic attacks that my wife had experienced during the pendency of the

26   adversary proceeding against her in 2002.  Words cannot describe the incalculable dread

27   and shock that we both experienced when we learned of the pending indictment on

28   November 8, 2005, when Special Agent John Hause approached me at my home and

Affidavit of Roland C. Colton

1   advised me that I was a target of a federal grand jury criminal proceedings.

2       23.    I was counsel-of-record in the civil case of *Insurance Ventures, Inc. v.*

3   *Vesta Fire Ins. Co. et al.,* Sacramento Superior Court Case No. 04AS00268, which was

4   filed in January of 2004.   Insurance Ventures was seeking to recover $30,000,000 in

5   damages from the Vesta Fire Insurance Company ("Vesta").   Shortly after Insurance

6   Ventures filed its lawsuit, Vesta filed a retaliatory action against Insurance Ventures, all

7   of its officers and attorneys (including myself), in federal court in Sacramento (Case No.

8   S-04-0296 FCD PAN.)  Vesta was represented in both cases by John (Jack) Pierce of

9   Barger & Wolen.   Both cases were aggressively litigated, and my deposition was taken in

10  the federal court action in September of 2005 by Jack Pierce.

11      24.    During the course of my civil deposition, Mr. Pierce went to great lengths

12  examining me on my bankruptcy schedules, including an intensive examination about

13  ownership of property in France, my wife's purchase of her residence, the major areas of

14  focus of the criminal investigation.   At that time, I had no knowledge that there was any

15  criminal investigation, nor was I aware of any possible future indictment.  In fact, I took

16  comfort in the fact that any potential criminal exposure on the bankruptcy case was long

17  since past.

18      25.    If I had known that there was an ongoing criminal investigation, I would

19  have had the opportunity to discuss with counsel the merits of invoking the Fifth

20  Amendment against self-incrimination during the deposition.  I had no reason to believe,

21  at that late date (especially with the promise of the Trustee's counsel not to pursue

22  criminal action) that there was any possibility of a criminal investigation, and therefore

23  did not consider invoking the privilege.

24      26.    During the course of reviewing discovery from the government, I

25  subsequently learned that Mr. Pierce had been in contact with the government and was

26  aware of the criminal investigation months before I was, and prior to my civil deposition

27  in the *Insurance Ventures* case.

28      27.    During the course of reviewing discovery from the government, I also

Case 2:17-cv-05872-DSF-KS   Document 66   Filed 03/18/19   Page 42 of 116   Page ID #:1426
.01/08/2008  17:20   8587920532                COLTON + ROESSER                      PAGE  01/01
Case 3:06-cr-0225?       Document 18-2   Filed 01/08/08      geID.42   Page 7 of 7

1   learned that the criminal investigation commenced in the summer of 2002, while my

2   bankruptcy case was pending, something that I was not aware of before. I further

3   observed, in looking through the discovery, that there was no action taken in the criminal

4   investigation following the "global settlement" until I had made all but the final payment

5   on my settlement.

6      28.   The shame and humiliation that has accompanied the indictment is

7   incalculable. If a person types in my name under "Google", the indictment is front and

8   center, along with the next several references as well. Maintaining a law practice with the

9   indictment hanging over my head has been extremely difficult. Phone interviews with

10  potential clients, who have expressed a strong interest in retaining my services, often

11  don't call back. If a meeting does ensue, I then feel compelled to disclose the indictment

12  and potential impact on my ability to perform legal services which, understandably, often

13  leads to a loss of the business.

14     29.   Because people are so quick to check you out these days, I am very leery

15  about giving out my full name or profession in making new acquaintances, such as

16  meeting parents of my daughters' friends at school activities or birthday parties.

17     30.   My wife comes from a very proud family. Her father is a prominent

18  businessman in Iran who frequently visits the U.S. along with his wife. Many of my

19  wife's relatives reside in Orange County. My wife prefers that news of my indictment not

20  be publicized among her family. As a result, she lives in fear that family members will

21  check us out on the internet, and that they will discover the indictment, leading to further

22  shame and embarrassment.

23     I declare under penalty of perjury that the foregoing is true and correct and that this

24  declaration was executed on the _8th_ day of _January_, 2008 at Laguna Niguel,

25  California.

26

27                                          Roland C. Colton

28

                                   7



RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT

MAR − 7 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

**By Fax**

1   N.  Alai

2   14 Monarch Bay Plaza, Suite 383

3   Dana Point, CA 92629

    714-886-9707

4   On Behalf of Amicus Curiae

5

6

7

8

9           **IN THE UNITED STATES DISTRICT COURT**

10          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11                   **WESTERN DIVISION**

12

13  BRUNILDA STEPHENS, et al.          CV 17-05872 DSF (KSx)

14          Plaintiff[s],              JUDGE:  Hon. Dale S. Fischer

15              v.                      Courtroom: 7D

16  NORDSTROM, INC. ET AL.             **AMICUS CURIAE BRIEF**
17  Defendant[s].                      **IN OPPOSITION TO**

18                                     **PLAINTIFF COUNSEL**

19                                     **ROLAND C. COLTON'S**

20                                     **APPLICATION AS LEAD**
                                       **COUNSEL**
21

22

23  **TO THE HONORABLE COURT, PARTIES, AND ATTORNEYS OF**

24  **RECORD:**

25  Non-party Nili Alai  herein "moving party" files the herewith request for leave of

26
                                       - 1 -
27  AMICUS CURIAE BRIEFING IN OPPOSITION TO  ROLAND C. COLTON APPLICATION FOR  LEAD  CLASS
                                   COUNSEL
28

court to file the referenced amicus curiae brief <u>in opposition</u> to Plaintiff counsel Roland C. Colton's application for lead class counsel. Moving party further files this brief and attached Lodgment of Exhibits in support of the Court's ruling denying Roland C. Colton's adequacy as class counsel.

## **STATEMENT**

Your Honor, moving party respectfully seeks leave of Court, thereby allowing the filing of this herewith Amicus Brief to inform the Court of the inadequacy of Roland C. Colton as lead, case, or class counsel in the referenced matter before this court. Whereby, providing information germane to the Court's prior Order to Show Cause as appointment of Colton et al. as lead counsel. the details of moving party's statement of facts are outlined in the Amicus Brief and Exhibits.

For the reasons set forth herein, it is requested that the Court grant leave to file said brief, and reconsider the appointment of Colton et al. as lead class counsel.

Mr. Colton has (1) suppressed the following facts from his declarations to the Court, (2) made materially false representations in his under-oath declarations as to his ability to represent the class, as well as (3) inserted "staged" and improbable claims in his pleadings to the Order to Show Cause as to Adequacy of Class Counsel.

Moreover, as the Court is aware, and the proximal relevance explained herein, the California Franchise Tax Board has filed as a "Claimant" in this matter due to Mr. Colton's current extreme tax delinquency to the State, which has placed Colton on the publicly posted California State site entitled "500 Largest Tax Delinquencies".

The referenced concealed facts about Roland C. Colton are sufficient for this Court to rule that Colton is not adequate to be appointed as class counsel, and include the following:

1. Colton's federal conviction for felony;
2. Colton's Federal Conviction for plea bargain as misdemeanor in 2011;
3. Colton's Supervised Release from 2011 to 2013;
4. Colton's Grand Jury Indictment for Fraud in San Diego;
5. Colton's Federal probation ending on or about Dec. 31, 2013;
6. Colton's financial crimes and habitual frauds;
7. Colton's false bankruptcies with fraudulent declarations;
8. Colton's twice prior public State Bar discipline; and
9. Colton's general moral turpitude and repeat acts of dishonesty.

As a note of knowledge of parties and their respective failure to disclose, it appears that Colton et al. likely also failed to inform the Court of the ongoing California Bar investigations about his misconduct, and federal

AMICUS CURIAE BRIEFING IN OPPOSITION TO ROLAND C. COLTON APPLICATION FOR LEAD CLASS COUNSEL

criminal charges against this lead attorney.  This is not entirely surprising considering their prior proven contemptuous actions before the California Courts. Mr. Colton's candor or lack thereof should therefore  facilitate the Court's ruling whether leave should be granted on consideration of this Amicus Brief.

Colton is also related to co-counsel Alexander "Ali" Eskanderi through marriage with Nahid Birjandi. Of note each counsel was, or is currently married to Ms. Birjandi at one time. Thus, Mr. Eskanderi is consummately aware or should be aware of the aforementioned facts including the two criminal trials about his co-counsel Roland C. Colton.

The Court should have the opportunity to be informed of Colton et al.'s criminal convictions and chicanery in order to

1. Protect members of the proposed class;
2. Protect public interest; and
3. Protect the integrity and general administration of justice before the Courts.

Respectfully Submitted,

/S/ N. Alai_____
**N. Alai**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SUMMARY OF AMICUS BRIEF

Non-party Nili Alai  herein "moving party" files the herewith amicus curiae brief in opposition to Plaintiff counsel Roland C. Colton's application for lead counsel in this action. Moving party further files this brief in support of the Court's Order denying Roland C. Colton's application in "adequacy as [class] counsel". (Decl. Alai ¶¶5-6)

For brevity and expedited filing of the Amicus Curiae Brief, moving party has within this brief detailed only very narrowly tailored Colton cases. While there are innumerable Fraud complaints filed and prosecuted against Colton in civil matters, those are for simplicity not named herein. Moving party is accessible and willing to file supplemental briefing in this matter as directed, or otherwise respond to further inquiry as requested by the Court.

## STATEMENT OF FACTS

Case lead counsel Mr. Roland C. Colton, State Bar No. 79896 is a twice publicly disciplined lawyer and convicted felon. Colton is also actively named, and does in fact currently appear on the Franchise Tax Board's site entitled "500 Largest Tax Delinquencies".   Colton was also tried for further crimes in *United States vs. Roland C. Colton*, whereby he was fined and placed on 2 years of supervised release and

federally ordered probation for "criminal contempt". His prior probation ended in December 2013.

As a matter of public record, the aforementioned facts are fully verified as of current date on these government sites:

1. https://www.ftb.ca.gov/aboutFTB/Delinquent-Taxpayers.shtml;  and

2. http://members.calbar.ca.gov/fal/Licensee/Detail/79896.

As further matter of public record, Colton's state and federal cases may be accessed at

1. U.S. District Court for the Southern District of California, Case No. 3:06-cr-02252, *United States v. Colton*

2. *In the Matter of Roland Clark Colton* State Bar Court Case No. 06-C-15151

3. *In the Matter of [Roland] Colton* (June 14, 1985) Cal. State Bar Ct. No. 84-C-00074

## JUDICIAL NOTICE OF THE SPECIFIED MATTERS IS AUTHORIZED.

Judicial notice is authorized and may be taken of "Regulations and legislative enactments issued by or under the authority of the United States or any public entity in the United States." Moreover, a "reviewing court may take judicial notice of matters not before the trial court." (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325.)  Therefore, judicial notice  is requested of the Exhibits labeled as Attachments"1" to "3" to this brief  and these facts:

1.  In 2010, Roland C. Colton  was featured in the U.S. Dept. of Justice Executive Office

for United States Report to Congress for top Criminal Referrals citing

Accessed at https://www.justice.gov/sites/default/files/ust/legacy/2011/07/13/

Rpt_to_Congress_ on_FY2006_Referrals.pdf   (PDF Exh. to SAC )

2.  State of California "Top 500 Delinquent Taxpayers" published pursuant to  Calf. Revenue and Taxation Code Section 19195.

- Pursuant to Public Contract Code 10295.4 State agencies will not enter into contracts for the acquisition of goods and services with Roland C. Colton.
- Delinquent listing "Roland C. Colton" was updated by the State of California Franchise Tax Board on  or about 1/07/2019.
- Roland C.  Colton remains on the delinquent tax list for unpaid personal tax, which is a violation of his State Bar Moral Character reference requirement.
- Roland Colton still owes the State $1,465,515.59 in unpaid personal income taxes. (Accessed https://www.ftb.ca.gov/aboutFTB/Delinquent-Taxpayers.shtml#PIT-Panel)

## CURRENT CASE CLAIMANT FRANCHISE TAX BOARD

The California Franchise Tax Board has filed as a "Claimant" in this matter due to Mr. Colton's current tax delinquency  of over $1.4 million dollars owed to the State

since prior to 2000, which has placed Colton on the publicly notified California State site entitled "500 Largest Tax Delinquencies". Colton also has equal or greater indebtedness for tax delinquency and evasion to the Internal Revenue Service.

Roland C. Colton's name currently appears on the State of California Board of Equalization "500 Largest Tax Delinquencies". (Accessed on 1/25/19 @ "Top 500 Delinquent Tax Payers" https://www.ftb.ca.gov/aboutftb/delinquent-taxpayers.shtml(a)(3)

Pursuant to Bus. and Profess. Code § 494.5(a)(3) Colton's name being included on the "500 Delinquent Tax Payers" then authorizes "The State Bar of California may recommend to refuse to issue, reactivate, reinstate, or renew a license and may recommend to suspend a license if a licensee's name is included on a certified list. The word "may" shall be substituted for the word "shall" relating to the issuance of a temporary license, refusal to issue, reactivate, reinstate, renew, or suspend a license in this section for licenses under the jurisdiction of the California Supreme Court.

Pursuant to Public Contract Code (PCC) § 10295.4. "(a) Notwithstanding any other law, a state agency shall not enter into any contract for the acquisition of goods or services with a contractor whose name appears on either list of the 500 largest tax delinquencies pursuant to Section 7063 or 19195 of the Revenue and Taxation Code. Any contract entered into in violation of this subdivision is void and unenforceable." *(b) This section shall apply to any contract executed on or after July 1, 2012.* (accessed http://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=PCC&sectionNum=10295.4.)

Pursuant to Bus. and Profess. Code §§ 494.5(a)(1)(2) Mr. Colton's name being included on the "500 Delinquent Tax Payers" then authorizes the Department of Motor Vehicles to suspend a license if a licensee's name is included in the certified list. Hence, Mr. Colton who has been driving regularly maybe doing so without a valid driver's license and should be further investigated.

Pursuant to B&P Code §494.5(q)(1) The Bar is authorized to proceed with suspending a member whose names appears on the certified delinquency list. "This subdivision may not be interpreted to prevent the State Bar of California from filing a request with the Supreme Court of California to **suspend a member of the bar pursuant to this section**."

Moreover, since B&P Code §494.5(q)(3) states the following, it is confirmed that Colton is **currently** in violation of Section 7063 or 19195 of the Revenue and Taxation Code and is currently listed on the "500 largest tax delinquencies". Hence as stated in "(3) Upon release from the certified list, the suspension or revocation of the applicant's or licensee's license **shall be purged from the state governmental licensing entity's Internet Web site or other publication within three business days**. This paragraph shall not apply to the State Bar of California", authorizes the judicial notice of the State of California's taxation records as correct and current.

**CONCLUSION**

We respectfully request that the Court perform a simple, organic Google search for terms "Roland Colton, attorney"   and ascertain in less than  2 minutes, that not only

is

AMICUS CURIAE BRIEFING IN OPPOSITION TO  ROLAND C. COLTON APPLICATION FOR  LEAD  CLASS COUNSEL

Roland C. Colton unfit as lead class counsel, but likely also unfit as counsel in general before this Court.

Moreover, it is more likely than not that Colton's Bar license will reasonably soon be appropriately restrained as authorized by and pursuant to Bus. and Professions Code § Code §494.5 (a)(3) "Suspension and Revocation of Licenses."

Based on the aforementioned facts, the Court is urged in the strongest terms that appointment of Roland Colton as lead class counsel is not in the interests of the class nor the public.

DATE: January 25, 2019

/S/ N. Alai
Nili Alai

AMICUS CURIAE BRIEFING IN OPPOSITION TO  ROLAND C. COLTON APPLICATION FOR  LEAD  CLASS COUNSEL

## **DECLARATION IN SUPPORT OF AMICUS BRIEF**

1. I am not a party to this action and am able to testify to these same facts if asked to do so.   I file the herewith brief and declaration in good faith, and not for any improper purpose.

2. I am aware of these facts based on my knowledge, and through admissions made by Roland Colton to me. I have known Colton in a personal and professional capacity for more than 10 years.

3. I am informed that on August 10, 2017 Colton began representing a Plaintiff in the referenced   case Nordstrom HauteLook Class Action. I am also aware that Colton is also involved in a  similar lawsuit  entitled  *Vahdat Aghdasy v. Nordstrom* Inc., et al., Case No. 2:16-CV-01829 in the U.S. District Court for the Central District of California.

4. Attached hereto as Attachments "1" to "3" are true and correct copies of a few *representative* Colton criminal convictions, federal court cases, and as well his Declaration submitted under oath in his criminal case *United States v. Roland Colton.*

5. It is my opinion that Roland Colton is unfit as class counsel as to his criminal convictions, habitual dishonesty, financial crimes, and career long moral turpitude, and that he should not be so appointed.

6. It is my opinion that Colton's perpetual frauds on the people as well the government, money laundering schemes to divert his funds to his French chateau, failure to abide by taxation laws, and the like make Colton unfit to have his license to practice law renewed.

7. Barring this Court's *sua sponte* referral to the Bar for the same, due to Colton's demonstrable unlawful conduct, it is my intent to file a Writ

1    of Mandamus and other applicable pleading for the State Bar to

2    <u>expedite</u> suspension and/ or disbarment of Colton pursuant to Bus. and

3    Professions Code §494.5 "Suspension and Revocation of Licenses",

4    and aggravated conduct by Colton.

5

6

7    January 25, 2019                                   <u>/S/ N. Alai</u>

8                                                       Nili Alai

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF ELECTRONIC SERVICE

I am not party to this action and am over the age of 18. My business address is 14 Monarch Bay Plaza Ste 383, Dana Point, California 92629. ON the aforementioned date I served the document entitled "Amicus Curiae  Brief and Exhibits" on these parties. I utilized an electronic account with Onelegal or equivalent source  to transmit these documents to the following parties.

## INTERESTED PARTIES


## FOR PLAINTIFF BRUNILDA STEPHENS
Roland C. Colton, Esq., SBN 79896
**COLTON LAW GROUP**
28202 Cabot Road
Third Floor
Laguna Niguel, CA. 92677
Telephone: (949) 365-5660
Facsimile: (949) 365-5662
Email: rcc7@msn.com

Alexander Escandari, Esq. SBN 183781
**L.A. TRIAL LAWYERS, INC.**
8730 Wilshire Boulevard
Fifth Floor
Beverly Hills, CA. 90211
Telephone: (310) 492-2000
Facsimile: (310) 492-2001

## FOR DEFENDANTS NORDSTROM ET AL.
Shauna Pearce, Esq.
Dana J Dunwoody
Sheppard Mulling Richter And Hampton LLP
spearce@sheppardmullin.com

## FOR CLAIMANT CALIFORNIA FRANCHISE TAX BOARD
Todd Murray Bailey

AMICUS CURIAE BRIEFING IN OPPOSITION TO  ROLAND C. COLTON APPLICATION FOR  LEAD  CLASS COUNSEL

California Franchise Tax Board
State of California
P O Box 1720, Mailstop A-260
Rancho Cordova, CA 95741-1720
916-845-6340
Email: todd.bailey@ftb.ca.gov
LEAD ATTORNEY, ATTORNEY TO BE NOTICED

I declare under penalty of perjury of the State of California that the aforementioned is true and correct.

DATE: January 25, 2019                    /S/ NAlai

                                          Nili Alai

AMICUS CURIAE BRIEFING IN OPPOSITION TO  ROLAND C. COLTON APPLICATION FOR  LEAD  CLASS COUNSEL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT "1"

## AFFIDAVIT OF ROLAND C. COLTON

1

2

3        I, Roland C. Colton, declare as follows:

4        1.      I am the defendant named in the within indictment.  I have personal

5    knowledge of the facts set forth in this declaration and, if called and sworn as a witness, I

6    would be competent to testify to such facts.

7        2.      I have been an attorney licensed to practice law in the State of California

8    since June 28, 1978.  I operated as a sole practitioner for many years before forming the

9    law partnership of Colton & Roesser in 1991.  My practice was based in San Diego

10   County until 2005, when I moved my offices to Orange County.  I married my present

11   wife, Dr. Nahid Birjandi ("Dr. Birjandi"), on June 18, 1999, and have resided with her

12   since that time in her Laguna Niguel residence.

13       3.      On October 11, 2001, I filed Chapter 7 bankruptcy in the Southern District

14   of California.  The Trustee appointed to the case was Richard Kipperman ("Trustee"),

15   represented by the law firm of Pyle, Sims, Duncan & Stevenson.

16       4.      On December 11, 2001, the Trustee's counsel sent me a letter demanding

17   that the law firm of Colton & Roesser be dissolved, that all assets of the partnership be

18   sold, and that any surplus be paid over to the Trustee.  In December, 2001, the Trustee's

19   counsel also sent me a letter seeking to terminate the lease where the law firm was

20   conducting business in Del Mar, California.

21       5.      The first session of my Rule 2004 bankruptcy examination took place one

22   month later, on January 15, 2002.  During this examination, I answered questions about

23   my finances, my wife's finances, and financial payments that I had made to my wife to

24   assist her in making mortgage payments on her residence.  During the deposition, the

25   Trustee's attorney, Peter Duncan, indicated to me and my counsel, "off the record", that

26   the Trustee might take legal action against my wife, in view of testimony that I had

27   provided her financial assistance.  I then advised Mr. Duncan that I had not notified my

28   wife of my bankruptcy, and requested that I be given notice before any legal action was

1  taken against my wife so that I could discuss it with her first to minimize the shock and

2  embarrassment to her and her family and the potential disruption to my marriage that was

3  likely to result; Mr. Duncan gave his word to me and my attorney that he would do so.

4        6.     Shortly thereafter, on January 30, 2002, *without any advance notice*, the

5  Trustee filed a lawsuit against my wife, Dr. Birjandi, seeking to force the sale of her

6  residence and pay over the proceeds to the Trustee. A *lis pendens* was also recorded

7  simultaneously against my wife's Orange County residence. The lawsuit also sought to

8  force the turnover of Dr. Birjandi's podiatric practice, a practice to which, as I had

9  testified, I had never given any financial support. The lawsuit and *lis pendens* were

10  served on my wife's parents (temporary guests at the residence), who then shared the

11  documents with my wife. She was in hysterics when she confronted me with the legal

12  action. To add to the stress, my wife and I had discovered only days earlier that she was

13  pregnant with our first child.

14        7.     Mr. Duncan later tried to justify his action by explaining that my wife had

15  dual citizenship and might flee the jurisdiction. Mr. Duncan's actions resulted in a

16  complete breakdown of trust between myself and the Trustee, greatly escalating the

17  acrimonious litigation between the parties. His unethical behavior continued as he

18  violated bankruptcy rules and protective orders entered into in my case.

19        8.     As hostilities increased, counsel for the Trustee threatened to file lawsuits

20  against my adult children – Jessica (age 26), Kimberly (age 24), Michael (age 21) and

21  Christopher (age 19) – for whom I had provided post-high school financial assistance

22  with respect to tuition, housing and support payments during prior years. At the same

23  time, the Trustee also threatened litigation against my law partner and law firm.

24        9.     Faced with staggering legal fees in defending the bankruptcy litigation and

25  adversary proceedings, along with the prospects of future legal action against my

26  children, my law partner and law firm, my attorney suggested moving for dismissal of the

27  bankruptcy petition. It was clear that I would never be able to obtain the fresh start that I

28  had sought, and that the personal and financial cost of litigating multi-front actions with

Affidavit of Roland C. Colton

1   the Trustee had become extremely burdensome, threatening my marriage, my children,

2   and my business relationships.

3        10.     In the midst of mounting litigation, my attorney approached the Trustee

4   about stipulating to a dismissal of my bankruptcy petition, wherein I would receive no

5   discharge of my debts.  The Trustee responded in writing, on May 21, 2002,  stating that

6   if I paid a $500,000 penalty and stipulated to a denial of discharge, that the Trustee would

7   agree to the stipulation.  I rejected the offer.

8        11.     Rebuffed by my rejection of the penalty payment, the Trustee raised the

9   stakes even higher.  On June 14, 2002, making good on his threat, the Trustee filed an

10  adversary action against my law partner and my law firm, attempting to force the law

11  firm's dissolution and to recover from my partner one-half of all draws that had been paid

12  to me since the filing of the petition, and seeking a termination of the partnership's lease.

13       12.     On July 1, 2002, I filed a motion to dismiss his bankruptcy petition.

14  Although the Trustee previously had been willing to stipulate to a dismissal (upon

15  payment of a substantial penalty), the Trustee now vigorously opposed the motion, and

16  the motion was denied.  The Trustee then went into full throttle against me and other

17  parties in the various adversary proceedings.

18       13.     During the pendency of the bankruptcy, with the assistance of counsel, I

19  was preparing amendments to my bankruptcy schedules to address any potential

20  omissions and inaccuracies contained therein.  The process of completing the

21  amendments was frequently diverted due to the constant barrage of motions, subpoenas

22  and other discovery matters coming from the Trustee that had to be responded to.  In

23  addition, my time was further compromised by the birth of my daughter on October 10,

24  2002. But for the onset of settlement discussions less than two weeks later, the

25  amendments would have been completed, and would have addressed the allegations

26  contained within the September 30, 2002 motion discussed below.

27       14.     On September 30, 2002, the Trustee filed an *ex parte* motion for a

28  temporary injunction (without notice), alleging that I had concealed assets and business

1   interests (including certain property located in France).   At the unopposed *ex parte*

2   hearing on October 15, 2002, the court granted the TRO.  On October 17, 2002, my

3   attorney and I were served with a copy of the motion and TRO, indicating a preliminary

4   injunction hearing set for October 25, 2002—just eight days later.

5        15.    On October 22, 2002, my attorney advised me that he had been told by

6   counsel for the Trustee, Susan Stevenson, that I "had better settle the case quickly if I

7   wanted to avoid future criminal action."  I perceived the comment to be borderline

8   extortion and asked Mr. Curry to note the conversation in my file.  I took very seriously

9   the implications of having to defend not only the multi-front civil litigation, but also

10   criminal proceedings in the future.

11        16.    Mr. Curry advised me that it would be in my best interests to settle the case

12   quickly in order to avoid criminal action.  As a result, settlement discussions ensued

13   rapidly.  During the course of the discussions, Mr. Curry made efforts to move the

14   discussions along as quickly as possible, at times telling me that I might be sacrificing

15   certain benefits by doing so.  For example, he believed that we could have negotiated a

16   lower financial obligation with the Trustee, given some additional time.  Foremost in my

17   mind was that we meet the Trustee's demand of reaching a prompt settlement before

18   criminal action was commenced.

19        17.    Forsaking the prior $500,000 penalty offer, the Trustee felt he had leverage

20   to ask for much more than before.  Over the course of the next few days, I ultimately

21   committed to paying the Trustee a penalty of up to $1,150,000,[1] plus agreed to pay an

22   additional $1,000,000 penalty in the event that I defaulted on the settlement agreement.

23   The Trustee also insisted that I not receive a discharge as part of the settlement.  Under no

24   circumstances would I have agreed to such excessive financial penalty and forfeited my

25   right to a discharge of debts, if I had not understood that the settlement wrapped up all

26

27   ─────────────────────

28   [1] I call the $1,150,000 figure a penalty because only a small fraction of the money would be used to pay creditors. The lion's share of the money was to be paid to the Trustee, his attorneys and experts, thus resulting in a minimal pay-down of debt with no discharge of bankruptcy.

4

1   aspects of my case, including any potential criminal action.

2         18.    In negotiating and drafting the settlement agreements, Mr. Curry advised

3   me on several occasions that he was taking care to include language as strong as possible

4   to make it clear that the settlement would encompass any potential criminal action as

5   well.

6         19.    Mr. Curry also told me that, since the threat of criminal action was gone

7   with the settlement, there would be no need to file any opposition or reply papers to the

8   Motion. He further indicated to me that there would be no need to complete the

9   amendments to my bankruptcy schedules.

10        20.    I also had discussions with my wife about moving quickly on the

11  settlement. With our newborn child less than two weeks old, I reluctantly shared with my

12  wife the veiled threat of criminal action if I did not act quickly to settle the case. My wife

13  was horrified about this possibility and told me that I needed to do whatever it took to

14  resolve the bankruptcy case immediately.

15        21.    My wife told me that if we were assured that there would be no criminal

16  action taken against me that she would assist me financially with the settlement. As a

17  result, she agreed to refinance her residence and allowed approximately $280,000 of the

18  refinance funds to be used to pay the Trustee in connection with my settlement.

19        22.    Despite that the settlement involved a huge financial toll for my family, my

20  wife and I attempted to put the past behind us and get on with our lives. Convinced that

21  there would not be a criminal action, we decided to have another child. A second

22  daughter was born to us on March 8, 2005. Neither my wife nor I would have considered

23  bringing another child into the world if we had believed that I would be facing an

24  indictment with a risk of years of imprisonment. I was particularly sensitive to the

25  anxiety and panic attacks that my wife had experienced during the pendency of the

26  adversary proceeding against her in 2002. Words cannot describe the incalculable dread

27  and shock that we both experienced when we learned of the pending indictment on

28  November 8, 2005, when Special Agent John Hause approached me at my home and

1    advised me that I was a target of a federal grand jury criminal proceedings.

2         23.    I was counsel-of-record in the civil case of *Insurance Ventures, Inc. v.*

3    *Vesta Fire Ins. Co. et al.,* Sacramento Superior Court Case No. 04AS00268, which was

4    filed in January of 2004.   Insurance Ventures was seeking to recover $30,000,000 in

5    damages from the Vesta Fire Insurance Company ("Vesta").   Shortly after Insurance

6    Ventures filed its lawsuit, Vesta filed a retaliatory action against Insurance Ventures, all

7    of its officers and attorneys (including myself), in federal court in Sacramento (Case No.

8    S-04-0296 FCD PAN.)  Vesta was represented in both cases by John (Jack) Pierce of

9    Barger & Wolen.   Both cases were aggressively litigated, and my deposition was taken in

10   the federal court action in September of 2005 by Jack Pierce.

11        24.    During the course of my civil deposition, Mr. Pierce went to great lengths

12   examining me on my bankruptcy schedules, including an intensive examination about

13   ownership of property in France, my wife's purchase of her residence, the major areas of

14   focus of the criminal investigation.   At that time, I had no knowledge that there was any

15   criminal investigation, nor was I aware of any possible future indictment.   In fact, I took

16   comfort in the fact that any potential criminal exposure on the bankruptcy case was long

17   since past.

18        25.    If I had known that there was an ongoing criminal investigation, I would

19   have had the opportunity to discuss with counsel the merits of invoking the Fifth

20   Amendment against self-incrimination during the deposition.   I had no reason to believe,

21   at that late date (especially with the promise of the Trustee's counsel not to pursue

22   criminal action) that there was any possibility of a criminal investigation, and therefore

23   did not consider invoking the privilege.

24        26.    During the course of reviewing discovery from the government, I

25   subsequently learned that Mr. Pierce had been in contact with the government and was

26   aware of the criminal investigation months before I was, and prior to my civil deposition

27   in the *Insurance Ventures* case.

28        27.    During the course of reviewing discovery from the government, I also

Affidavit of Roland C. Colton

0021

Case 2:17-cv-05872-DSF-KS   Document 66   Filed 03/18/19   Page 64 of 116   Page ID #:1448
01/08/2008  17:20   85879??532        COLTON + ROESS?        PAGE  01/01
Case 3:06-cr-0225?      Document 18-2   Filed 01/08/08  . .geID.42   Page 7 of 7

1  learned that the criminal investigation commenced in the summer of 2002, while my

2  bankruptcy case was pending, something that I was not aware of before. I further

3  observed, in looking through the discovery, that there was no action taken in the criminal

4  investigation following the "global settlement" until I had made all but the final payment

5  on my settlement.

6      28.    The shame and humiliation that has accompanied the indictment is

7  incalculable. If a person types in my name under "Google", the indictment is front and

8  center, along with the next several references as well. Maintaining a law practice with the

9  indictment hanging over my head has been extremely difficult. Phone interviews with

10  potential clients, who have expressed a strong interest in retaining my services, often

11  don't call back. If a meeting does ensue, I then feel compelled to disclose the indictment

12  and potential impact on my ability to perform legal services which, understandably, often

13  leads to a loss of the business.

14      29.    Because people are so quick to check you out these days, I am very leery

15  about giving out my full name or profession in making new acquaintances, such as

16  meeting parents of my daughters' friends at school activities or birthday parties.

17      30.    My wife comes from a very proud family. Her father is a prominent

18  businessman in Iran who frequently visits the U.S. along with his wife. Many of my

19  wife's relatives reside in Orange County. My wife prefers that news of my indictment not

20  be publicized among her family. As a result, she lives in fear that family members will

21  check us out on the internet, and that they will discover the indictment, leading to further

22  shame and embarrassment.

23      I declare under penalty of perjury that the foregoing is true and correct and that this

24  declaration was executed on the *8th* day of *January*, 2008 at Laguna Niguel,

25  California.

26

27  _____
    Roland C. Colton

28

7

Affidavit of Roland C. Colton

0022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT

# "2"

AO 245B (CASD) (Rev. 12/11) Judgment in a Criminal Case
Sheet 1

**FILED**
DEC 2 ? 2011
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | (For Offenses Committed On or After November 1, 1987) |
| ROLAND C COLTON (1) | |

Case Number: 06CR2252-W

Roland C Colton
Defendant's Attorney

*FILED*
*DEC 27 2011*

REGISTRATION NO. 67644098
☐

THE DEFENDANT:
☒ pleaded guilty to count(s) SUPERSEDING INFORMATION

☐ was found guilty on count(s)_____
after a plea of not guilty.
Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
| --- | --- | --- |
| 18 USC 401(3) | CONTEMPT (MISDEMEANOR) | 1 |

The defendant is sentenced as provided in pages 2 through ___3___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)_____

☒ Count(s) remaining in the Indictment _____ is ☐ are ☒ dismissed on the motion of the United States.

☒ Assessment: $25.00

☒ Fine waived        ☐ Forfeiture pursuant to order filed _____, included herein.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

I have executed within Prob
Judgement and Commitment on 12/22/2011
United States Marshal

By: K Rich
USMS Criminal Section

DECEMBER 19, 2011
Date of Imposition of Sentence

HON. THOMAS J. WHELAN
UNITED STATES DISTRICT JUDGE

06CR2252-W

0024

AO 245B (CASD) (Rev. 12/11) Judgment in a Criminal Case
Sheet 2 — Probation

DEFENDANT: ROLAND C COLTON (1)
CASE NUMBER: 06CR2252-W

Judgment—Page    2    of    3

## PROBATION

The defendant is hereby sentenced to probation for a term of :

### TWO (2) YEARS

The defendant shall not commit another federal, state, or local crime.

*For offenses committed on or after September 13, 1994:*

The defendant shall not illegally possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter as determined by the court. Testing requirements will not exceed submission of more than _8_ drug tests per month during the term of supervision, unless otherwise ordered by court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

☒ The defendant shall cooperate in the collection of a DNA sample from the defendant, pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000, pursuant to 18 USC sections 3563(a)(7) and 3583(d).

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. (Check if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution obligation, it is a condition of probation that the defendant pay any such fine or restitution in accordance with the Schedule of Payments sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the special conditions imposed.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

06CR2252-W

AO 245S    Judgment in Criminal Case
           Sheet 5 — Criminal Monetary Penalties

Judgment — Page __3__ of __3__

DEFENDANT: ROLAND C COLTON (1)
CASE NUMBER: 06CR2252-W

# RESTITUTION

The defendant shall pay restitution in the amount of _____ $405,811.00 _____ unto the United States of America.

This sum shall be paid _____ immediately.
                        _x_  as follows:

It is ordered that the defendant pay restitution in the amount of $405,811.00 through the Clerk, U.S. District Court. No restitution payments will be required for the first six months after entry of Defendant guilty plea, so long as Defendant undertakes best efforts to negotiate a payment plan with the Franchise Tax Board ("FTB") to resolve this debt. If Defendant and the FTB reach agreement as to a payment schedule, that same schedule will be the restitution payment schedule. If no payment plan is reached between Defendant and the FTB within six months, Defendant shall be required to pay restitution of $2,500 per month, beginning 7/20/12.

Restitution is to be paid to the following victim, and directed to the following address:

| Name | Amount |
| --- | --- |
| California Franchise Tax Board | $405,811.00 |
| Attn: Nancy Parker | |
| P.O Box 1720, MS A-260 | |
| Rancho Cordova, Ca. 65741 | |

Until restitution has been paid, the defendant shall notify the Clerk of the Court and the United States Attorney's Office of any change in the defendant's mailing or residence address , no later than thirty (30) days after the change occurs

The Court has determined that the defendant    does    have the ability to pay interest.  It is ordered that:

_____    The interest requirement is waived.

_____    The interest is modified as follows:

06CR2252-W

0026

KAREN P. HEWITT
United States Attorney
ERIC J. BESTE
California State Bar No. 226089
VALERIE H. CHU
California State Bar No. 241709
Assistant U.S. Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-5104 / 7837
Fax: (619) 557-7055
Email: Eric.Beste@usdoj.gov,
Valerie.Chu@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 06CR2252-W |
| Plaintiff, | **GOVERNMENT'S TRIAL MEMORANDUM** |
| v. | DATE:     January 21, 2009 |
| | TIME:     9:00 a.m. |
| | CTRM:    7 (3rd Floor) |
| ROLAND C. COLTON, | JUDGE:   Honorable Thomas J. Whelan |
| Defendant. | |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and Eric J. Beste and Valerie H. Chu, Assistant U.S. Attorneys, and hereby files its Trial Memorandum.

## I

## STATUS OF THE CASE

A.   INDICTMENT

On October 17, 2006, a Federal Grand Jury in the Southern District of California returned a seven-count indictment against defendant Roland C. Colton ("Colton") charging him with bankruptcy fraud, in violation of various provisions of 18 U.S.C. § 152. Count 1 alleges that Colton falsely stated under penalty of perjury in his bankruptcy petition and accompanying schedules that he had no interest in real property and personal property, although he in fact did have interests in real property located in

1   France and Laguna Niguel, California, and in over $1.5 million in personal property such as bank and

2   brokerage accounts, in violation of 18 U.S.C. § 152(3).  Counts 2, 3 and 4 allege that Colton gave false

3   testimony under oath in examinations taken pursuant to Fed. R. Bank. P. 2004 ("Rule 2004

4   examination"), in violation of 18 U.S.C. § 152(2).  Count 2 concerns Colton's false claim in his January

5   15, 2002 examination that his schedules were correct and that they accurately identified all of his assets

6   and liabilities.  Count 3 concerns Colton's false claim that he maintained no other bank accounts.  Count

7   4 concerns Colton's false assertion that he had not contributed anything towards the purchase of his

8   Laguna Niguel estate.  Count 5 alleges that Colton gave false testimony under oath in his Rule 2004

9   examination on August 14, 2002, when he testified that he paid $85.86 in foreign taxes in 2000.  Count

10  6 alleges that Colton knowingly and fraudulently concealed real and personal property in France

11  belonging to the debtor's estate from creditors and the bankruptcy trustee, in violation of 18 U.S.C.

12  § 152(1).  Count 7 alleges that Colton knowingly and fraudulently concealed ownership, control and

13  possession of numerous financial accounts belonging to the debtor's estate from creditors and the

14  bankruptcy trustee, in violation of 18 U.S.C. § 152(1).

15      B.      JURY TRIAL

16      This case is presently set for trial on January 21, 2009.  No jury waiver has been filed.

17      C.      STATUS OF COUNSEL

18      Colton is proceeding pro se.  At the last status hearing on December 11, 2008, Defendant moved

19  to represent himself.  The parties appeared that day before Magistrate Judge Bencivengo, and after

20  conducting a *Faretta* hearing, Judge Bencivengo relieved retained counsel Jeremy Warren and granted

21  Colton's motion to represent himself.  Colton appeared before this Court later that day, and confirmed

22  his awareness of the trial date.  No standby counsel has been appointed.

23      D.      CUSTODIAL STATUS

24      Colton is out of custody on a $50,000 personal appearance bond.

25      E.      INTERPRETER

26      The government may need a French-English interpreter for several witnesses during its case-in-

27  chief or in rebuttal.

28

### F.   LENGTH OF TRIAL

At the status hearing on August 18, 2008, parties jointly estimated that the trial would occupy approximately 2 weeks.  Since then, Colton has released his counsel and decided to proceed pro se.  At the status hearing on December 11, 2008, Colton indicated that he intended to file motions that he expected would reduce the length of trial.  At this time, the government believes this trial will be completed in 2 weeks.

### G.   COURTROOM COMPUTER SYSTEM

The government will be using a computer-based evidence presentation system including individual monitors located at the bench, the witness stand, and at counsel tables for the government and the defense.

### H.   DISCOVERY

The United States has complied with its discovery obligations, including again making documents available for Colton's inspection which his previous counsel had already seen.  Colton has not produced any reciprocal discovery, and the government will object to the introduction of any documents by Colton which have not been produced in discovery at this time.

### I.   PRE-TRIAL MOTIONS

On January 6, 2009, the government filed motions in limine to: (1) preclude allegations of government misconduct; (2) preclude pro se defendant from presenting evidence in his role as attorney; (3) admit the expert testimony of trial counsel for the U.S. Bankruptcy Trustee; (4) preclude self-serving hearsay; (5) admit defendant's statements to his bankruptcy attorney made for the purpose of filing his bankruptcy petition; (6) admit evidence of Nahid Birjandi's 1994 bankruptcy filing; (7) admit evidence of Colton's prior tax conviction pursuant to Fed. R. Evid. 609 should he testify; (8) preclude defense exhibits not produced in reciprocal discovery; (9) use trial exhibits in opening statement; (10) exclude witnesses other than the case agents; and (11) order reciprocal discovery.

Colton has not filed any motions in limine.

Consistent with the Court's chambers rules, motions in limine are scheduled to be heard on the morning of trial, January 21, 2009.

//

3

06CR2252-W

0029

J.    <u>EXHIBITS</u>

By January 15, 2009, the government will make available to Colton a preliminary exhibit list and a set of pre-marked exhibits. The government will provide an updated list to the Court and to defense counsel on the morning of trial. The government's exhibit list will be updated during trial to reflect additional exhibits that the government finds it necessary to introduce.

K.    <u>JURY INSTRUCTIONS</u>

The government's proposed jury instructions will be submitted under separate cover.

## II

## **STATEMENT OF FACTS**

A.    <u>THE DEFENDANT</u>

Colton, a seasoned trial attorney, graduated from the University of Utah with a degree in accounting, and obtained his law degree from the University of San Diego. Before his admission to the California bar in 1978, Colton was a practicing accountant. At all times material to the indictment, Colton was a partner in the Del Mar law firm of Colton & Roesser.

Since 1998, Colton has resided in a $2.375 million estate in Laguna Niguel, California, with his current wife, Nahid Birjandi, a podiatrist. Colton vacations regularly in France, where he typically spends 2-3 months every summer. For example case, during the pendency of this case Colton's bond was modified to permit him to travel to France for vacation. While in France Colton stays at his vacation home, known as Chateau de la Briche.

B.    <u>COLTON'S BANKRUPTCY CASE</u>

    1.    <u>Colton's Filings</u>

On October 11, 2001, defendant electronically filed a voluntary Chapter 7 bankruptcy liquidation petition ("Petition") and attached schedules with the United States Bankruptcy Court for the Southern District of California, seeking a discharge of some $2.7 million in debts, and attached schedules. These schedules included: (1) a summary of assets and liabilities; (2) specific lists of assets and liabilities; (3) schedules of income and expenses; (4) schedules of exempt assets; and (5) a statement of financial affairs ("Schedules"). Colton electronically signed, and later manually signed, a certification attesting

1   to the truth, completeness and accuracy of the statements contained in the Petition and Schedules.

2   Colton signed both of these certifications under penalty of perjury.

3        In the Petition and Schedules, Colton falsely claimed only $15,650 in assets, consisting of $100

4   in cash, a Washington Mutual checking account worth $200, a television, a computer, a grand piano and

5   his interest in his law partnership, Colton & Roesser, which he valued at $10,000.  He claimed that he

6   no "any legal, equitable, or future interest" in any real property, "including [any] property owned as a

7   co-tenant, community property, or in which the debtor has a life estate."  Defendant also denied that

8   there was any real property in which he held rights and powers exercisable for his own benefit.  Colton

9   claimed he had no interest in any other personal property, including any automobiles, other businesses,

10   investment accounts, retirement plans, or insurance policies.

11        Colton also claimed that during the prior year he had not made any payments to creditors who

12   were insiders, had not given gifts, had not incurred gambling losses, had not executed any property

13   transfers, and had not closed any financial accounts.  He claimed his monthly income was $6,533, and

14   that he and his family had monthly expenses of $7,119 (including $2,500 in "rent or home mortgage

15   payment").  Defendant's claimed liabilities consisted of large California Franchise Tax Board

16   assessments, court judgments, and credit card debts.

17        On October 11, 2001, the United States Bankruptcy Court for the Southern District of California

18   appointed Richard Kipperman ("Trustee Kipperman") as a private Chapter 7 bankruptcy trustee.

19   Trustee Kipperman was obligated to identify, and then recover and distribute, assets that were to be for

20   the benefit of the debtor's estate.  Trustee Kipperman retained bankruptcy counsel, Peter Duncan and

21   Susan Stevenson, to assist in this task.

22        2.    Colton's Statements Under Oath

23        On January 21, 2002, Duncan conducted a Rule 2004 examination, under oath, of Colton.

24   During that examination, Duncan asked Colton the following questions:

25

26   Q:   Are there any changes to the [bankruptcy] schedules of which you are presently aware?
     A:   I think the one my attorney referred to we need to make.
27   Q:   Any other changes?
     A:   Not that I can think of.
28

5

06CR2252-W

0031

Q:      So other than amending the schedules to add the Chevron royalty interest, the schedules are true and correct to your knowledge?
A:      I think so.
Q:      And they accurately identify all of your assets and liabilities other than the Chevron royalty?
A:      Yes.

At the same session, Duncan asked Defendant about the check register, copies of bank statements, and copies of checks for the single Washington Mutual account listed on his Petition. Specifically, Duncan asked:

Q:      All right. Sir, we are looking at Exhibit 4, which is your register and statements and checks, and the question pending was are there any other statements or checks of which you are aware that are not in Exhibit 4 for the period?
A:      Not to my knowledge.
Q:      Okay. Is this the only bank account you maintained personally during the period that is reflected in Exhibit 4?
A:      I believe so.
Q:      Okay. Any record that would refresh your recollection to the contrary?
A:      I can't think of anything.

Duncan also questioned Defendant closely regarding a residence located in Laguna Niguel, California. Colton's wife (Nahid Birjandi) was listed on the title as the owner of the property, but Duncan wanted to know if Colton helped pay any of the $2.375 million purchase price, thereby resulting in Colton (and his bankruptcy estate) having at least an equitable interest in the property. Duncan asked:

Q:      Did you contribute anything towards the down payment of the property?
A:      No.

Counsel for Trustee Kipperman conducted further investigation into these and other facts in order to determine whether assets of the estate were available to satisfy creditor claims. This investigation led Trustee Kipperman to file separate adversary proceedings against: (1) Colton, his law partner Roesser, and their partnership to recover the debtor's interest in additional income from the partnership; and (2) Colton's wife (Dr. Nahid Birjandi) to recover the debtor's community property interest in their multi-million dollar home.

Colton's Rule 2004 examination did not conclude on January 15, 2002, but continued on two other occasions. In the follow-up session held on August 14, 2002, Duncan's law partner Susan Stevenson asked Colton about a deduction he claimed in his 2000 federal income tax return for $8,685 paid in foreign taxes. By this time, Trustee Kipperman had learned that Colton may have had an interest in real estate known as Chateau de la Briche located in Hommes, France. Colton had claimed attorney-

1   client privilege in response to questions by Stevenson as to whether Colton had visited Chateau de la

2   Briche, and in what town Chateau de la Briche was located.   Coming at it from another direction,

3   Stevenson attempted to clarify the reason Colton paid $8,586 in foreign taxes, as claimed on his tax

4   return:

5   Q:   Do you know if you paid any foreign taxes in 2001?
    A:   I don't believe so.
6   Q:   Because I see in 2000 you paid – I don't know, it seems to me like a lot of foreign taxes
         – about $8500, $8600.  Do you know what government or country they were paid to?
7   A:   I think that's inaccurate.
    Q:   Is your tax return inaccurate or is my characterization of Exhibit A to the tax return
8        [which includes the line-item for foreign taxes]
    A:   I believe the amount paid was not accurate as indicated on the tax return.
9   Q:   So you're saying if I look at the tax return I'm going to find a statement that eighty-five,
         eighty-six in foreign taxes is inaccurate?
10  A:   Well, this came up during the previous 2004 examination.  And when I looked at the
         information that I transmitted to [Colton's tax preparer] Mr. Hatch, I think it was $85.86
11       or whatever the number is.
                                              * * *
12  Q:   Okay.  Here we have Exhibit A, itemized deductions to your 2000 return with the
         eighty-five, eight-six amount.  Is that what you're saying is inaccurate, it should be
13       $85.86?
    A:   That's correct.

14

15      Trustee Kipperman eventually obtained proof that Colton was in fact the owner of the Chateau

16  in France, as well as of several brokerage and bank accounts, some of which he held in the names of

17  shell companies (e.g., Sports Gaming, Inc., Southwest Drilling, etc.).  Based on the evidence indicating

18  that Colton had other assets available for the bankruptcy estate, and that he might dissipate those assets

19  outside of the normal bankruptcy process, Trustee Kipperman obtained an *ex parte* order from the

20  bankruptcy court restraining Colton's bank accounts and preventing him from selling or encumbering

21  the Chateau and his Laguna Niguel home.

22      C.   COLTON'S ACTUAL FINANCIAL CONDITION

23      In contrast to the modest $15,650 in total assets Colton disclosed on his Petition, Colton actually

24  had interests in millions of dollars worth of real and personal property in the U.S. and France, and had

25  control over several accounts in the U.S. and in France through which hundreds of thousands of dollars

26  flowed at his behest.

27  //

28  //

06CR2252-W

1.   <u>Laguna Niguel Residence</u>

In late 1998, Nahid Birjandi, then Colton's fiancé, was looking for a new home for herself and her new husband.  The couple settled on a newly-built custom home overlooking the Pacific Ocean, located on 59 Asilomar Road in Laguna Niguel, California.  The seller agreed with Colton (who negotiated the transaction) to a purchase price of $2,375,000.  Birjandi's claimed income of approximately $10,000 per year was nowhere near enough to make the monthly mortgage payments or cover the necessary expenses of the property.  Thus, through a variety of complicated financial transactions and behind-the-scenes moves, Colton provided almost all the money Birjandi used to purchase the property and make the monthly mortgage payments.

First, Colton obtained a $1,400,000 mortgage loan in Birjandi's name from Hawthorne Savings Bank.  While Birjandi's name would be the only one on the note, Colton personally promised the bank that he would help make the payments.  Colton told the loan officer that he did not want his name on the mortgage papers because he was going through a messy divorce, and did not want to be formally obligated on the loan.  But Colton's assistance was necessary to obtain the loan, as Birjandi clearly could not qualify for the $1.4 million loan on her minimal income.

Second, Colton secured a portion of Birjandi's down payment by obtaining a $553,500 loan for her from a second bank, Pioneer Citizens Bank of Nevada.  Again, the note was in Birjandi's name, but it was collateralized by a Certificate of Deposit (CD) in the amount of $553,000 posted by a company owned and controlled by Colton.  Colton provided thousands of dollars over the course of the next year to Birjandi for her to make the interest payments on this loan, and when the note was due Colton simply directed that the CD be liquidated and the funds used to pay off Birjandi's note.

Third, Colton negotiated a second mortgage "take back" from the seller of the property in the amount of $329,000.  Colton provided funds used by Birjandi to make the payments on this note, and even wire-transferred $189,718.84 from a brokerage account he controlled directly to the lender.

After arranging for the purchase of 59 Asilomar Road, Colton continued provided the funds for Birjandi to make the monthly mortgage payments on the couple's estate.  Between March 1999 and March 2000, Colton directed Charles Schwab to transfer thousands of dollars out of a brokerage account he controlled – the account was in the name of "Sports Gaming," a Nevada corporation of which he was

8

1    the President, Secretary, Treasurer, and Director – into a bank account owned by Birjandi. Colton

2    regularly transferred in excess of the $12,000 per month needed by Birjandi to make the required

3    mortgage payment.

4          Colton was living at 59 Asilomar when he filed for bankruptcy in October 2001. But the

5    property was identified nowhere on his Petition and Schedules. Instead, Colton listed his address on

6    the Petition as his office in Del Mar where his law firm was located. When asked in his Rule 2004

7    examinations about his interest in the property, Colton contended that he only paid his wife $2,500 per

8    month in rent to live there.

9          2.    Chateau de la Briche

10         In or about July 1999, Colton purchased Chateau de la Briche, a French castle located a few

11   hours outside Paris, for over 7 million francs (over $1 million at the time). Built in 1870, the castle has

12   5 stories and dozens of rooms, including an entrance hall, library, billiards room, sitting room, drawing

13   room, dining room, back staircase, kitchen, and eating area (and all that just on the first floor). The

14   property also includes multiple outbuildings (e.g., horse tables, tack room, garage, barns, greenhouses,

15   kennels, gardener's building and living quarters, etc.), a swimming pool, vineyards, water tower,

16   orangery, pleasure gardens, a vegetable garden, woods, meadows and footpaths.

17         To finance the purchase, Colton applied for a loan from CaixaBank in Poitiers, France. In his

18   application and in various letters to bank officials, he presented a far different picture of his financial

19   condition than that depicted in his Petition. In response to a bank officer's inquiries, Colton authored

20   a letter with additional information about "my most significant investments," including:

21         - a bank account at Home Savings of America, valued at $4,596.74;

22         - a Charles Schwab brokerage account, valued at $1,087,714.44;

23         - a $30,000 loan from a colleague;

24         - his "residence: 59 Asilomar," with a purchase price of $2,375,000, a current value of

25   $2,800,000, an outstanding loan amount of $1,100,000, and furnishings worth over $737,000;

26         - a Young-Chang piano valued at $15,000, and a "Steinway (Concert Grand)" piano valued at

27   $75,000; and

28         - two cars: a Mercedes Benz valued at $20,000, and a Jaguar XJ 220 valued at $400,000.

1    On the CaixaBank formal loan application Colton listed himself as the only borrower, and listed

2    his residence as 59 Asilomar Road. He stated that his annual salary was between 3,000,000 to 6,000,000

3    francs (approximately $475,000 and $950,000), and claimed that he owed approximately 900,000 Francs

4    on a mortgage. Colton claimed to own many assets in his application, including his residence at 59

5    Asilomar (valued at 17,000,000 Francs), his law firm (valued at 3,000,000 francs), and miscellaneous

6    personal property, such as securities and vintage cars (valued at over 15,000,000 francs). Colton

7    requested a long term loan in the amount of 4,200,000 francs to purchase "Chateau de la Briche," which

8    he described as a single family house to be used as his vacation home.

9    Colton made clear to the bank that he was purchasing the Chateau as his own separate property,

10   and not jointly with his wife, or for any other party. He wrote in a letter contained in his loan file:

11       I hereby certify that all of the funds which will be used to purchase the Chateau de la
         Briche come from funds that I had prior to marriage and which I have maintained
12       separate since marriage. I further certify that all the funds which will be used to make
         payments on the chateau will also come from the same separate funds. **Accordingly,**
13       **ownership of the chateau will be in my name alone, as my separate property**.

14   The sales contract lists the buyer of the property as "Mr. Roland Clark COLTON, Attorney." The

15   contract lists the financing as a 4,200,000 Fr loan from CaixaBank, to be paid in 144 monthly payments

16   of 37,231.05 Fr (5,674.84 Euros), and a 3,650,000 Fr down payment from Colton. The total purchase

17   price of the Chateau was 7,850,000 Fr.

18   French property records show that Colton paid property taxes, lodging taxes, and sanitation taxes

19   for Chateau de la Briche from 2000 up until at least 2006. In the year 2000, his payment of French

20   property and lodging taxes on the Chateau alone exceeded $6,000.

21                    3.    <u>French Financial Accounts</u>

22   Colton opened an account at CaixaBank on or about July 20, 1999, around the time he purchased

23   the Chateau. Throughout 2001 this CaixaBank account remained open and active. Colton identified

24   himself as the sole account holder and his listed his address as 59 Asilomar, although he later he gave

25   his wife power of attorney on the account. During the years 1999, 2000 and 2001, Colton periodically

26   transferred thousands of dollars into this account from a Charles Schwab account in the name of "Sports

27   Gaming, Inc." Records from the CaixaBank account show monthly withdrawals in the amount of the

28   mortgage Colton owed on the Chateau (37,231,05 Francs).

<div align="center">10</div>

1    Throughout 2001, Colton also wrote checks on his CaixaBank account and deposited them into

2    another account, held in his own name, at the French bank Credit Agricole. Colton opened the Credit

3    Agricole account as a joint account with his wife, and listed his address on the application as "Chateau

4    De La Brich." This Credit Agricole account was active in October 2001, when Colton filed for

5    bankruptcy.

6    Colton failed to disclose the existence of any of these foreign accounts in his Petition or

7    Schedules, or the many transfers into and out of these accounts – some of which took place just a few

8    days before he filed for bankruptcy.

9            4.    <u>Domestic Financial Accounts</u>

10   Unlike his foreign accounts, which were in his own name, Colton created layers between himself

11   and his domestic accounts. He controlled the Charles Schwab brokerage account described earlier

12   (which he listed as one of his most significant assets in his letter to the French bank), although the name

13   on the account was a company called Sports Gaming, Inc. Colton opened this account for Sports

14   Gaming on February 12, 1999. Colton frequently transferred money out of this account by sending wire

15   transfer instructions specifying the following:

16       I am the sole authorized signer for the above-referenced account. Please accept this
     document as wire instructions for transferring funds to the account indicated below. I
17   realize that the funds are going to an account that is not in my name. Accordingly,
     Sports Gaming, Inc. is giving up legal ownership to the funds that are being wired.
18

19   Colton also controlled an account at Washington Mutual Bank in the name of "Southwest

20   Drilling, Inc.," another company he incorporated. Expenditures on this bank account include debit-card

21   payments for restaurants, hotels, and travel, including travel expenses incurred in France. Colton also

22   concealed this account in his bankruptcy.

23   Colton maintained another account in his own name at California Bank and Trust that he failed

24   to disclose on his Petition and Schedules. Although the address on the account was Colton's business

25   address, the transfers of funds out of the account show that it was used for Colton's personal expenses.

26   For example, between October 2000 and April 2002, Colton transferred approximately $198,980 from

27   this account to his CaixaBank account, and another $198,000 from this account to an E*Trade brokerage

28   account in his name (which was also omitted from his Petition). In April 2002, only after being

<div align="center">11</div>

1   questioned in detail about his finances during his Rule 2004 examination, did Colton change the name

2   on this account from his own name to something called "JMK Family Trust."

3                   **4.**      Other Assets Concealed by Colton

4         Colon concealed from the bankruptcy court several other substantial assets that he owned and

5   used for his benefit.  He purchased a Peugeot automobile in France for over $20,000 in June 2000, and

6   registered the car in his own name.  In his 1999 loan application for the Chateau, he claimed to be the

7   sole owner of a Jaguar XJ220 sports car valued at approximately $400,000.  When he was in California,

8   Colton sometimes drove a BMW with the vanity licence plate "Briche."  Yet on his Petition and

9   schedule, Colton asserted that he owned no cars.

10   <center>**III**</center>

11   <center>**LEGAL PRINCIPLES**</center>

12   A.   ELEMENTS OF THE OFFENSES

13          **1.**      False Declaration, Certificate, Verification or Statement Under Penalty of
Perjury (18 U.S.C. § 152(3))

14
15         Colton is charged in Count 1 with making a false declaration, verification, or statement on

16   his Petition and Schedules.  To prove a violation of this statute, the government must show that:

17        **1.**      On or about the date alleged in the indictment, the proceeding in
            bankruptcy was in existence;

18        **2.**      Defendant knowingly and fraudulently made, and caused to be made, a
19               false declaration, certification, verification or statement in that
            bankruptcy proceeding or in relation to that bankruptcy proceeding;

20        **3.**      The false declaration, certificate, verification, or statement was made
21               under penalty of perjury, and

22        **4.**      The statement was as to a material fact.

23   2 Devitt, Blackmar & O'Malley, Federal Jury Practice and Instructions, § 24.07 (4th ed. 1990); *United*

24   *States v. Gaudin*, 515 U.S. 506, 522 (1995).

25   //

26   //

27   //

28   //

<center>12</center>

2.    <u>False Oaths or Accounts (18 U.S.C. § 152(2))</u>

Counts 2 - 5 of the indictment charge Colton with making false statements under oath during his Rule 2004 examinations on January 15, 2002 and August 14, 2002.  The elements of these offenses are:

1.    On or about the date alleged in the indictment, the proceeding in bankruptcy was in existence,

2.    Defendant knowingly and fraudulently made, or caused to be made, a false oral statement in that bankruptcy proceeding or in relation to that bankruptcy proceeding,

3.    The false oral statement was made under oath, and

4.    The false statement was as to a material fact.

2 Devitt, Blackmar & O'Malley, Federal Jury Practice and Instructions, § 24.07 (4th ed. 1990); *United States v. Gaudin*, 515 U.S. 506, 522 (1995).

A statement in bankruptcy is materially false if it has a natural tendency to influence or be capable of influencing the bankruptcy trustee, any creditors, or the bankruptcy court.  *Kungys v. United States*, 485 U.S. 759, 770 (1988); Ninth Circuit Criminal Model Jury Instructions § 8.66 (2003).

3.    <u>Concealment of Property (18 U.S.C. § 152(1))</u>

Counts 6 and 7 charge Colton with concealing from the trustee real property and personal property belonging to the estate.  To prevail on these counts the government must prove:

1.    On or about the date alleged in the indictment, the proceeding in bankruptcy was in existence,

2.    Defendant knowingly and fraudulently concealed property from a custodian, trustee, marshal, creditor or United States trustee, and

3.    The property belonged to the estate of the debtor.

2 Devitt, Blackmar & O'Malley, Federal Jury Practice and Instructions, § 24.03 (4th ed. 1990).

The estate of the debtor includes both legal and equitable interests.  *United States v. Weinstein*, 834 F.2d 1454, 1461 n.2 (9th Cir. 1987).  Withholding information about an asset constitutes concealment under § 152.  *Id.* at 1462.

//

//

//

06CR2252-W

B.    USE OF SUMMARY EVIDENCE

1.    Summary Witness (Financial Analyst Aaron Rich)

The government intends to call Federal Bureau of Investigation ("FBI") financial analyst Aaron Rich to testify as to the preparation of schedules and charts summarizing Colton's voluminous financial documents.  Rich, who is a certified public accountant and has received training in commercial accounting and forensic accounting, will help the jury understand Colton's bank records and financial statements, and describe to the jury the flow of funds into and out of bank accounts controlled by Colton.  His testimony will be predicated entirely upon documents that are admissible in evidence, and which have been made available to the defense for review and inspection.

The use of summary witnesses has long been approved by the courts.  *See United States v. Johnson*, 319 U.S. 503, 519-20 (1943) (reversing where court failed to allow summary witness testimony in a tax evasion prosecution); *United States v. Baker*, 10 F.3d 1374, 1411 (9th Cir. 1993) (noting "this circuit has often allowed the use of summary charts and summary witness testimony based on testimonial evidence (most commonly in tax cases)"), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000).  As the Ninth Circuit has recognized, summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses."  *United States v. Shipley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (citation omitted).  Because Financial Analyst Rich will not be offering "expert opinions" – but merely adding and subtracting amounts found on Colton's various financial records – his testimony does not fall within Fed. R. Evid. 702 and need not be disclosed pre-trial pursuant to Fed. R. Crim. P. 16.

2.    Summary Charts or Schedules of Voluminous Evidence

In addition to the testimony of a summary witness, the government intends to offer through the witness several summary schedules of voluminous evidence.  These summaries are admissible under Federal Rule of Evidence 1006, which provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.  The court may order that they be produced in court.

14

1    Fed. R. Evid. 1006. "The purpose of Rule 1006 is to allow the use of summaries when the volume of

2    documents being summarized is so large as to make their use impractical or impossible; summaries may

3    also prove more meaningful to the judge and jury." *United States v. Johnson,* 594 F.2d 1253, 1255 (9th

4    Cir. 1979) (citation omitted).   The proponent of a summary under Rule 1006 must establish the

5    admissibility of the underlying documents in order to introduce the summary. *See United States v.*

6    *Meyers,* 847 F.2d 1408, 1411-12 (9th Cir. 1988) (allowing government to admit a summary chart of

7    telephone calls and surveillance logs which helped clarify "confusing" events).

8         Financial Analyst Rich's testimony will be based upon his review of several years' worth of

9    account statements from several different domestic and foreign financial accounts associated with

10   Colton. These statements were made available to Colton for his review, and are admissible as business

11   records.  Rule 1006 summaries are particularly appropriate where summaries organize information

12   derived from a large number of documents into an understandable format. *See e.g., Keith v. Volpe,* 858

13   F.2d 467, 480 (9th Cir. 1988) (summaries necessary to clearly present government agency files).

14        C.    USE OF BUSINESS RECORDS

15             1.    Domestic Records of Regularly Conducted Activity

16        The government intends to offer into evidence many documents that qualify as "business

17   records," and thus are free from the prohibition on hearsay. *See* Fed. R. Evid. 803(6), 902(11).  The

18   government has notified Colton in writing of its intention to use Rule 902(11) certifications, and has

19   invited Colton to review the certifications and the underlying documents.

20             2.    Foreign Records of Regularly Conducted Activity

21        The government will also seek to admit business records from France concerning Colton's

22   purchase of the Chateau, his purchase of a Peugeot automobile, and his CaixaBank and Credit Agricole

23   accounts – none of which he disclosed in his bankruptcy Petition. These records are admissible over

24   any authenticity or hearsay objection because they comply with the requirements of 18 U.S.C. § 3505.

25        "Pursuant to § 3505, '[i]n a criminal proceeding in a court of the United States, a foreign record

26   of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the

27   hearsay rule if a foreign certification attests . . .' to the requirements specified in the statute." *United*

28   *States v. Hagage*, 437 F.3d 943, 956 (9th Cir. 2006) (quoting § 3505).  A foreign certification under

1  § 3505 must state that "(A) such record was made, at or near the time of the occurrence of the matters

2  set forth, by (or from information transmitted by) a person with knowledge of those matters; (B) such

3  record was kept in the course of a regularly conducted business activity; (C) the business activity made

4  such a record as a regular practice; and (D) if such record is not the original, such record is a duplicate

5  of the original; unless the source of information or the method or circumstances of preparation indicate

6  lack of trustworthiness." 18 U.S.C. § 3505(a)(1).  If a foreign certification meets these requirements,

7  then the proponent of the evidence need not call a live witness to establish its authenticity, and the

8  foreign record may not be excluded as hearsay.  *Hagege*, 437 F.3d at 957.  The Ninth Circuit has

9  specifically held that foreign business records admitted pursuant to § 3505 are not subject to the

10  Confrontation Clause requirements of *Crawford v. Washington*, 541 U.S. 36 (2004), and are sufficiently

11  reliable and part of a "firmly rooted" hearsay exception to satisfy *Ohio v. Roberts*, 448 U.S. 56 (1980).

12  *Hagege*, 437 F.3d at 958.

13       The records at issue here – records of Colton's accounts at CaixaBank and Credit Agricole, his

14  purchase of a Peugeot, and his purchase of the Chateau – are each accompanied by a certification from

15  a qualified custodian.  These certifications will be offered into evidence at the time the underlying

16  documents are moved into evidence.  Colton was notified in writing in November 2007 of the

17  government's intention to rely on § 3505 certifications to admit these records.

18       D.   <u>USE OF FOREIGN PUBLIC RECORDS AND ACKNOWLEDGED DOCUMENTS</u>

19       The government may seek to introduce records from public agencies in France concerning

20  Colton's ownership of the Chateau, his payment of fees and taxes on the Chateau, and his ownership

21  of a Peugeot automobile.  Such records, if offered, will be admissible over any authentication or hearsay

22  objections by Colton.

23       Foreign public documents are deemed authentic if under Fed. R. Evid. 902(3) if "executed or

24  attested in an official capacity by a person authorized by the laws of a foreign country to make the

25  execution or attestation, and accompanied by a final certification as to the genuineness of the signature

26  and official position (A) of the executing or attesting person, or (B) of any foreign official whose

27  certificate of genuineness of signature and official position relates to the execution or attestation in a

28  chain of certificates of genuineness of signature and official position relating to the execution or

16                                    06CR2252-W

1   attestation." Fed. R. Evid. 902(3). Even if a final certification is not available, a court may still treat

2   such documents as presumptively authentic if good cause has been shown, and a "reasonable

3   opportunity had been given to all parties to investigate the authenticity and accuracy of official

4   documents." *See United States v. Chung Kong Yin*, 935 F.2d 990, 994-95 (9th Cir. 1991).

5           Documents that are acknowledged by a notary public "or other officer authorized by law to take

6   acknowledgments" are self-authenticating. Fed. R. Evid. 902(8); *United States v. M'Biye*, 655 F.2d

7   1240, 1242 (D.C. Cir. 1981) (notarized affidavit); *United States v. Estate of Oxarango*, 2008 WL

8   5411719, *4 (D. Idaho Dec. 24, 2008) (recorded mortgages and promissory notes). Many of the

9   documents provided by French authorities are notarized or acknowledged by French judicial officers

10   authorized by law to take such acknowledgments.

11           Public records are not hearsay so long as they are "[r]ecords, reports, statements, or data

12   compilations, in any form, of public offices or agencies, setting forth . . .the activities of the office or

13   agency . . . ." Fed. R. Evid. 803(8). Each of the public records to be offered into evidence contain

14   records and data compilations concerning the activities of the appropriate public office – e.g., the

15   Ministry of the Economy, Finances and Industry has provided records of taxes owed by Colton on the

16   Chateau, and the Office of the Mayor of Hommes has provided records demonstrating Colton's

17   ownership of the Chateau. Therefore, each of these public records fit within an exception to the rule

18   against hearsay.[1]

19      E.     UNDERLINE{USE OF RESIDUAL HEARSAY EXCEPTION}

20           The previous owners of the Chateau (as listed on the sales contract with Colton) were Joseph

21   Jacques Bouchard and his wife Marie Marcelle Carole Maranda. The couple authored a French

22   language book about their lives at the Chateau, with photographs of many interior rooms and unique

23   features of the castle. The government may seek to introduce this self-authenticating book and its

24   contents under the residual hearsay exception, Fed. R. Evid. 807. The government has notified Colton

25

26

27       [1] Records from France concerning the Chateau may be admissible under several theories. For
     example, the purchase contract signed by Colton is admissible under Fed. R. Evid. 801(d)(2) because

28   it was signed and adopted by Colton, and under Fed. R. Evid. 803(14) because it is a record of a
     document affecting an interest in property.

<center>17</center>

1   of this book (which it only recently acquired), and advised him in writing that it may seek to rely on

2   Rule 807 to overcome any hearsay objection.

3         F.    TRANSLATIONS

4         Many of the documents relating to Colton's French assets (including documents written and

5   signed by Colton) are written in the French language.  The government has provided Colton with

6   certified translations of these documents.  However, to date, Colton has refused to stipulate to the

7   accuracy of these translations.  Accordingly, the government may be required to call the French

8   language specialist (Christian Degueldre) who translated the documents to establish their authenticity

9   and accuracy for the jury.  Mr. Degueldre's substantial qualifications have been provided to Colton.

10        G.    EXPERT TESTIMONY

11         The government may call Mary Testerman DuVoisin, a Trial Attorney with the United States

12   Trustee's Office, as an expert witness to provide background in the area of bankruptcy.  Ms. Testerman

13   DuVoisin's qualifications and anticipated testimony has been provided to Colton, as required by Fed.

14   R. Crim. P. 16.

15         Other witnesses will necessarily testify about the bankruptcy process in order to explain what

16   they did and why they did it.  For example, as counsel for Trustee Kipperman, Peter Duncan was

17   engaged to determine if assets were available to satisfy Colton's estate.  In order to do so, Duncan had

18   to analyze Colton's possible equitable and marital property interests in 59 Asilomar Road, in addition

19   to other assets.  While Duncan will not offer "expert opinions" as to whether Colton in fact owned or

20   did not own certain assets, he will be asked why he inquired into certain areas during his Rule 2004

21   examination of Colton.  This testimony will be relevant to prove the materiality of Colton's falsehoods,

22   and their potential impact on his bankruptcy.  While the government does not believe such testimony

23   falls under Fed. R. Evid. 702, out of an abundance of caution, it has provided Colton with written notice

24   of Duncan and Stevenson's qualifications and anticipated testimony.

25                  **V**

26              **WITNESSES**

27         The government may call the following individuals as witnesses in its case-in-chief at trial, but

28   reserves the right to call additional witnesses during its case-in-chief or in rebuttal:

<div align="center">18</div>

| 1 | 1. | Paulette Ancharoff |
| 2 | 2. | Roy Carlson |
| 3 | 3. | Jessica Colton |
| 4 | 4. | Christopher Colton |
| 5 | 5. | Glen Dean |
| 6 | 6. | Christian Degueldre |
| 7 | 7. | Jacques Dessoles |
| 8 | 8. | Peter Duncan |
| 9 | 9. | Mary Testerman DuVoisin |
| 10 | 10. | Pierre Gravel |
| 11 | 11. | Teresa Hardke |
| 12 | 12. | Phillip Hatch |
| 13 | 13. | John Hause |
| 14 | 14. | Jean-Francois Lefay |
| 15 | 15. | Robert Love |
| 16 | 16. | Kathleen Love |
| 17 | 17. | David Oleksow |
| 18 | 18. | Michael Peters |
| 19 | 19. | Donald Pelgrim |
| 20 | 20. | Aaron Rich |
| 21 | 21. | Susan Stevenson |
| 22 | 22. | Armand Vallette |
| 23 | 23. | Philippe Vidoni |
| 24 | 24. | Jeannette Leon Vittorio |
| 25 | // |  |
| 26 | // |  |
| 27 | // |  |
| 28 | // |  |

06CR2252-W

0045

# VI

## **EXHIBITS**

Under separate cover, the government is providing Colton with a draft exhibit list and copies of its anticipated exhibits. On the morning of trial, the government will provide Colton and the Court with a final exhibit list, and will provide the Court with copies of its anticipated exhibits.

# VII

## **VOIR DIRE**

In addition to the Court's standard questions to the venire, the government requests that the Court consider inquiring of the panel in the following areas:

1.  Has anyone been involved in the bankruptcy process, either as a debtor, a creditor, or in some other capacity?

2.  Has anyone had any experiences with agents from the Federal Bureau of Investigation that would make it difficult for you to sit as an impartial juror in this case?

3.  Has anyone had experiences with the United States Trustee's Office that would make it difficult for you to sit as an impartial juror in this case?

4.  Does anyone have any training or experience in the law, and particularly in the area of bankruptcy law?

5.  Some of the evidence you may see in this case comes from France. Does anyone speak or read French? Would you be able to put aside what you know about the French language, and accept what the court-certified French translator says is the English translation of any testimony or evidence in the French language?

6.  Has anyone had any particularly positive or negative experiences with the Internal Revenue Service or the California Franchise Tax Board?

7.  Does anyone have any training or experience in the area of estate planning, such as wills and trusts?

//

//

//

20

06CR2252-W

1    The government respectfully requests permission from the Court to personally address the venire

2    and ask follow-up questions.

3          DATE: January 14, 2009                    Respectfully submitted,

4                                                    KAREN P. HEWITT
                                                     United States Attorney
5
                                                     /s/ Eric J. Beste
6                                                    ERIC J. BESTE
                                                     Assistant U.S. Attorney
7
                                                     /s/ Valerie H. Chu
8                                                    VALERIE H. CHU
                                                     Assistant U.S. Attorney
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

06CR2252-W

1      UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF CALIFORNIA

3

4                                              )   Criminal Case No. 06CR2252-W
       UNITED STATES OF AMERICA,               )
5                                              )
                      Plaintiff,               )
6              v.                              )   CERTIFICATE OF SERVICE
                                               )
7      ROLAND C. COLTON,                       )
                                               )
8                     Defendant.               )
                                               )
9      _____)

10

11     IT IS HEREBY CERTIFIED THAT:

12         I, Eric J. Beste, am a citizen of the United States and am at least eighteen years of age.  My
       business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

13         I am not a party to the above-entitled action.  I have caused service of the
       GOVERNMENT'S TRIAL MEMORANDUM on the following parties by electronically filing the
14     foregoing with the Clerk of the District Court using its ECF System, which electronically notifies
       them:

15
           Roland C. Colton, rcc7@msn.com
16
           I declare under penalty of perjury that the foregoing is true and correct.
17
           Executed on January 14, 2009
18
                                        s/ Eric J. Beste
19                                      ERIC J. BESTE

20

21

22

23

24

25

26

27

28

                                                                              06CR2252-W

                                                                         0048

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ATTACHMENT

# "3"

PUBLIC MATTER – NOT DESIGNATED FOR PUBLICATION

Filed August 30, 2013

## STATE BAR COURT OF CALIFORNIA

## REVIEW DEPARTMENT

| | | |
|---|---|---|
| In the Matter of | ) | Case No. 06-C-15151 |
| | ) | |
| ROLAND CLARK COLTON, | ) | OPINION AND ORDER |
| | ) | |
| A Member of the State Bar, No. 79896. | ) | |
| | ) | |

Roland Clark Colton appeals from a hearing judge's recommendation that he receive a one-year stayed suspension and probation due to his 2011 misdemeanor conviction. He seeks a public reproval with conditions. We agree with Colton because the hearing judge relied on a factual error in his analysis.

Colton's misconduct occurred nearly 12 years ago, in 2001, when he submitted a form containing an inaccurate entry to the Trustee in his own bankruptcy case. Five years later, in 2006, federal prosecutors filed bankruptcy fraud charges against him. After the jury failed to reach a verdict, Colton pled guilty to misdemeanor contempt for not cooperating with the Trustee.

The record in the disciplinary trial below is very limited. The Office of the Chief Trial Counsel (State Bar) relied entirely on a stipulation to prove its case. This stipulation provided that the facts and circumstances surrounding Colton's conviction did not constitute moral turpitude, but did involve other misconduct warranting discipline. It also offered the only evidence of the facts and circumstances of Colton's conviction – that he incorrectly marked the bankruptcy form and then failed to ensure that it was accurate in all material respects before it was submitted to the Trustee. Colton testified briefly on his own behalf.

Colton has one prior record of discipline since he was admitted to the Bar in 1978. He was disciplined in 1985 due to his 1983 federal conviction for aiding and abetting the preparation of two false income tax returns for clients. His misconduct occurred in 1981. Due to strong mitigation, he received only a public reproval with conditions. In the present conviction case, the hearing judge imposed a stayed suspension as progressive discipline under Rules of Procedure of the State Bar, title IV, Standards for Attorney Sanctions for Professional Misconduct, standard 1.7(a).[1]

On review, Colton seeks a public reproval with conditions, asserting that progressive discipline is not warranted because his prior case is remote in time and his present misconduct was minimal. He argues that the hearing judge gave too much weight to his 1985 discipline based on an incorrect finding that it occurred only *six* years before his present (2001) misconduct when, in fact, *16* years had passed. The State Bar asks that we affirm the hearing judge's recommendation despite this error. The main issues on appeal are: (1) what weight to assign the 1985 discipline case; and (2) whether to apply progressive discipline (stayed suspension) instead of a public reproval.

After independently reviewing the record (Cal. Rules of Court, rule 9.12), we find that progressive discipline is not warranted. We give less weight to Colton's prior discipline case than the hearing judge did because it is remote in time and the misconduct was extensively mitigated. In addition, Colton's present misconduct was minimal and it occurred almost 12 years ago. Since that time, he has practiced law without further ethical violations. Overall, Colton's mitigation far outweighs the aggravation of his 1985 discipline. We conclude that a public

---

[1] All further references to standards are to this source. Standard 1.7(a) directs that the degree of discipline imposed on an attorney with a prior record of discipline "shall be greater than that imposed in the prior proceeding unless the prior discipline imposed was so remote in time to the current proceeding and the offense for which it was imposed was so minimal in severity that imposing greater discipline in the current proceeding would be manifestly unjust."

-2-

reproval with conditions will adequately protect the public, the courts, and the legal profession without imposing punishment on Colton.

## I. FACTS AND CIRCUMSTANCES SURROUNDING COLTON'S CONVICTION[2]

For purposes of attorney discipline, Colton's conviction proves his guilt of all requisite elements of his crime. (Bus. & Prof. Code, § 6101, subd. (a).)[3] After the State Bar transmitted the conviction records to us, we referred the matter to the hearing department to determine whether the facts and circumstances of the crime involved moral turpitude or other misconduct warranting discipline and, if so, the proper level of discipline. (§ 6102, subd. (e); *In re Kelley* (1990) 52 Cal.3d 487, 494.) Since the parties stipulated that the facts and circumstances of the conviction constituted other misconduct warranting discipline, we "look to the whole course of [Colton's ] conduct which reflects upon his fitness to practice law," not merely the elements of the crime, to determine the proper discipline. (*In re Hurwitz* (1976) 17 Cal.3d 562, 567.)

### A.      Colton Filed Bankruptcy in 2001

Colton was admitted to the Bar 34 years ago in 1978. He has practiced law primarily as a solo practitioner doing general litigation and tax work. In 1999, he began experiencing financial difficulties. By 2001, he decided to file a Chapter 7 bankruptcy to discharge his personal debts. Colton hired a bankruptcy attorney because he lacked experience in this area of law. He provided his financial information to the attorney, who prepared the bankruptcy forms. Once the bankruptcy petition was filed in October 2001, the court appointed a Trustee and entered an Order of Relief, which obligated Colton to cooperate with the Trustee in administering the estate.

---

[2] Our findings are based on the parties' Stipulation as to Facts, Conclusion of Law, and Admission of Documents, the trial evidence, and the hearing judge's findings. (Rules Proc. of State Bar, rule 5.155(A) [hearing judge's factual findings entitled to great weight on review].)

[3] All further references to sections refer to the Business and Professions Code.

0052

### B.    Colton Submitted an Inaccurate Bankruptcy Document

On November 16, 2001, Colton appeared before the Trustee for a meeting of creditors. He was required to submit a form entitled "341(a) Meeting of Creditors, Questionnaire" (Questionnaire) to the Trustee before the meeting. Colton's attorney arrived late and had not yet completed the Questionnaire. His attorney hastily prepared the document, which he gave to Colton to sign, indicating that it contained the financial information they had discussed. Contrary to his usual practice, Colton did not read the Questionnaire before he signed and submitted it to the Trustee.[4]

The Questionnaire included a series of "check-off" boxes, including one that asked if Colton was a beneficiary or trustee of any trusts. Colton's attorney had marked "no" in response. This was incorrect since Colton was a trustee of his irrevocable family trust. Colton testified that his attorney believed this trust was not subject to the bankruptcy. Ultimately, Colton dismissed the bankruptcy case without discharging any debt, and the Questionnaire never became part of the bankruptcy file.

### C.    Criminal Charges Were Filed Against Colton Five Years After Misconduct

Colton's error on the Questionnaire ultimately led to criminal charges being filed against him. In 2006, he was charged with seven counts of criminal misconduct related to bankruptcy fraud in the U.S. District Court for the Southern District of California, Case No. 3:06-cr-02252, *United States v. Colton*. In 2009, the case proceeded to trial but ended in a hung jury. The prosecutor called Colton two and one-half years later in December 2011, and suggested a plea agreement to a lesser charge. Colton consented because he wanted to finalize the matter without putting his family through another trial.

---

[4] At the time, Colton was suffering significant personal stress. His wife developed health issues and almost died, which left her with frequent bouts of anxiety. Although he testified his problems did not impact his ability to practice law, they caused him great concern.

### D.    Colton Pled Guilty to One Count of Criminal Contempt

On December 19, 2011, Colton pled guilty to violating 18 U.S.C. § 401(3) (Criminal

Contempt – Misdemeanor).  The written plea agreement recited the factual basis for the crime as

follows: "By submitting this form [the Questionnaire] to the Trustee, and failing to ensure that it

was accurate in all material respects, [Colton] willfully resisted the lawful Order of Relief . . .

which required [Colton] to cooperate with the Trustee."  He was sentenced to two years'

supervised probation and ordered to pay a $25.00 assessment.[5]  Colton agreed, as an additional

term of probation, to pay restitution of $405,811, plus penalties and interest, to the California

Franchise Tax Board (FTB) for taxes owed from 1992 to 1998.

### E.    The Discipline Trial

The State Bar presented the stipulation to prove the facts and circumstances surrounding

the conviction.  It stated, in relevant part, that Colton: (1) attended the creditors' meeting; (2)

failed to correctly mark the "check-off" box indicating he was a trustee of any trust; and (3)

failed to "ensure that [the Questionnaire] was accurate in all material respects" before submitting

it to the Trustee.  While certain facts in the record raise concerns about Colton's misconduct –

such as initial bankruptcy fraud charges and the large amount of restitution paid to the FTB – the

State Bar failed to present evidence from which we might conclude that Colton's misconduct

was more serious than the stipulation recited.

Colton testified at his discipline trial about his professional background, other facts and

circumstances surrounding his conviction, and his pro bono and community service.  He

repeatedly acknowledged his wrongdoing, admitting that he erred by not reading the

Questionnaire before signing it: "I'm meticulous in my own practice and advising clients to read

documents so it's not [an] excuse.  I don't offer it as an excuse.  I accept full responsibility for

---

[5] The maximum penalty for this crime included six months in prison, a $5,000 fine, a
mandatory special assessment of $25, and a term of supervised release of not more than one year.

0054

my failure." He testified that he is complying with the terms of his criminal probation, including making monthly restitution payments of $2,500 to the FTB.

## II. MITIGATION AND AGGRAVATION

The offering party bears the burden of proof for aggravation and mitigation. The State Bar must establish aggravating circumstances by clear and convincing evidence.[6] (Std. 1.2(b).) Colton has the same burden to prove mitigating circumstances. (Std. 1.2(e).)

### A.    Four Mitigating Factors

The hearing judge found two factors in mitigation – cooperation and community service/pro bono work. Colton requests that we assign credit for several additional factors. We find that he proved a total of four mitigating factors.[7]

#### 1. Cooperation (Std. 1.2(e)(v))

Colton entered into a stipulation with the State Bar, and conceded that his misconduct warranted discipline. As a result, the State Bar did not call witnesses to testify at trial. Colton's cooperation greatly facilitated the trial and is entitled to significant mitigation. (*In the Matter of Johnson* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179, 190 [extensive weight in mitigation given to those who admit culpability and facts].)

#### 2. Community Service/Pro Bono Work

Pro bono work and community service are mitigating factors. (*Calvert v. State Bar* (1991) 54 Cal.3d 765, 785.) Colton testified that he has provided these services throughout his career, but expanded them to fill 200 hours per year during the past five to 10 years. He

---

[6] Clear and convincing evidence leaves no substantial doubt and is sufficiently strong to command the unhesitating assent of every reasonable mind. (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 552.)

[7] Colton also claimed mitigation credit for: good faith; a lenient sentence in the criminal matter; family and financial difficulties at the time of his misconduct; lack of harm; and the negative impact of a stayed suspension on his law practice. We find that he failed to prove these factors by clear and convincing evidence.

-6-

performed pro bono legal work and participated in church activities, such as teaching Sunday school and playing the piano and organ. While this commendable community service merits mitigation credit, we diminish the weight because Colton offered only his own testimony. (*In the Matter of Shalant* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 829, 840 [limited mitigation weight for community service established solely by attorney's testimony].)

### 3. Recognition of and Remorse for Misconduct (Std. 1.2(e)(vii))

Although the hearing judge did not find this factor in mitigation, we assign modest weight to Colton's recognition of and remorse for his misconduct. In the criminal matter, he entered into a plea agreement and is complying with his probation terms. At his discipline trial, he admitted he carelessly failed to read the Questionnaire before he signed it. And in his brief on review, he acknowledged that "his conduct did not comport with the high duty required of attorneys in dealing with judicial matters."

### 4. Passage of Time Since Misconduct (Std. 1.2(e)(viii))

Standard 1.2(e)(viii) provides mitigation for the "passage of considerable time since the acts of professional misconduct occurred followed by convincing proof of subsequent rehabilitation." The hearing judge assigned no mitigating credit for the passage of over 10 years from 2001 (present misconduct) to 2011 (discipline trial), noting that Colton "has been the object of ongoing criminal prosecution during the majority of that time."

We assign some mitigation credit for the passage of time without misconduct. Colton practiced law without ethical problems for five years following his 2001 misconduct before the 2006 criminal charges were filed. He continued to practice law discipline-free for five more years through his 2011 discipline trial. Given his cumulative 34 years in practice, we do not believe Colton acted ethically during these 10 years simply because a criminal prosecution was pending for part of that time. (*Amante v. State Bar* (1990) 50 Cal.3d 247, 256 [three years of

untarnished post-misconduct practice given limited mitigation credit]; *Rodgers v. State Bar*
(1989) 48 Cal.3d 300, 305, 308, 316-317 [five years of unblemished post-misconduct practice
demonstrated attorney's ability to adhere to standards of professional behavior and considered
mitigating].)

**B.      One Aggravating Factor**

The hearing judge properly found that Colton's 1985 record of discipline (*In the Matter*
*of Colton* (June 14, 1985) Cal. State Bar Ct. No. 84-C-00074) is an aggravating factor.
(Std. 1.2(b)(1).)  We agree, but diminish its weight because the misconduct was strongly
mitigated and is remote in time.  Even the State Bar prosecutor conceded at trial that Colton's
prior discipline is "remote in time" and that "some level of mitigation will likely be given for his
discipline free record since the [1985] prior."  A 1985 stipulation between the State Bar and
Colton sets out the particulars of that case, as detailed below.

In 1979, the year after Colton was admitted to the Bar, several church members hired him
to represent Major Dynamics.  This company offered solar energy tax shelters to investors.
Before long, the principals began defrauding the investors by misusing the investment monies.
Colton did not initially suspect the fraud nor did he know that the investment tax deductions and
credits were improper.  By 1980, he knew that people managing Major Dynamics were back-
dating contracts.  And by 1981, he was on notice "as to the need to inquire further regarding
serious irregularities in the operation of Major Dynamics."  Yet, in 1981, he prepared tax returns
for an investor and the investor's wife claiming invalid deductions and credits for the solar
panels.  His willful failure to inquire about the company's irregularities before preparing those
returns constituted "a reckless indifference for the truth."

Federal prosecutors charged Colton with violating 26 U.S.C. § 7206(2) (aiding and
abetting the preparation and filing of false income tax returns).  In 1983, he pled guilty and was

sentenced to a suspended two-year prison term, subject to a five-year probation period, and 60 days in a jail-type institution.[8]

In 1985, Colton was disciplined for his conviction that involved moral turpitude, in violation of section 6101. No aggravating circumstances existed and there were 11 factors in mitigation.[9] Colton received a public reproval with conditions.

In assigning full aggravating weight to Colton's prior discipline, the hearing judge miscalculated the time period as only six years between that case (1985) and the present misconduct (2001). Correcting the time span to 16 years, and considering the minimal discipline imposed, we properly afford only limited aggravating weight to Colton's 1985 discipline case. (See *In the Matter of Hanson* (Review Dept. 1994) 2 Cal. State Bar Ct. Rptr. 703, 713 [no significant aggravation for prior discipline where misconduct occurred 17 years earlier, resulted in private reproval, and involved acts unrelated to present misconduct]; *In the Matter of Shinn* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 96 [no significant aggravation for prior discipline where misconduct occurred 20 years earlier, resulted in public reproval, and involved acts unrelated to present misconduct].)

### III. LEVEL OF DISCIPLINE

This proceeding is not intended to punish Colton for his wrongdoing; the criminal court has handled that. Instead, the purpose of attorney discipline is to protect the public, the courts

---

[8] The record does not establish whether Colton's 1985 conviction was a felony or misdemeanor. At oral argument, the State Bar represented that all parties understood it was a misdemeanor.

[9] Those stipulated pre-standard mitigating factors were that Colton: (1) had no disciplinary record; (2) was young and inexperienced; (3) trusted the principals; (4) provided a valid legal tax opinion when first hired; (5) believed the investment would be successful; (6) never actually knew the investor funds were being misused; (7) had himself been an investor victim; (8) believed the tax deductions and credits were proper when he prepared the investor's return; (9) visited the company's office only twice and had no access to its files; (10) voluntarily paid the investors $130,000 as returned commissions; and (11) produced character and support letters from investors who had lost money.

and the legal profession, to preserve public confidence in the profession, and to maintain high professional standards for attorneys. (Std. 1.3.)  Ultimately, we balance all relevant factors, including mitigating and aggravating circumstances, on a case-by-case basis to ensure that the discipline imposed is consistent with its purpose. (*In re Young* (1989) 49 Cal.3d 257, 266.)  Our analysis begins with the standards, which are guidelines we follow whenever possible to promote uniformity of discipline. (*In re Silverton* (2005) 36 Cal.4th 81, 91-92.)

## A.    No Progressive Discipline Under Standard 1.7(A)

On review, Colton requests the same discipline he received in his 1985 case – a public reproval with conditions.  Standard 1.7(a) provides for progressive discipline unless the prior record was (1) so remote, and (2) the misconduct was so minimal that it would be manifestly unjust to impose a greater discipline.  Colton argues that since he meets this two-prong exception, progressive discipline is not warranted.  We agree.

As to the first prong, Colton's 1985 prior discipline is remote in time, as the State Bar conceded at trial.  He assisted his clients in filing false tax returns in 1981, was convicted of the criminal offense in 1983, and was publicly reproved in 1985.  Then in 2001, he committed his present misconduct, 20 years after his past wrongdoing, and 16 years after he was publicly reproved for it.  In total, it has been 32 years to date since Colton committed the misconduct in his prior discipline case (1981 to 2013).

As to the second prong, Colton's past misconduct involving moral turpitude was significantly mitigated.  He received only a public reproval, a lenient discipline reflecting that the misconduct was minor.  (See *In the Matter of Hanson, supra,* 2 Cal. State Bar Ct. Rptr. at p. 713 [private reproval in previous discipline case indicated "misconduct itself was minimal in nature"].)

Colton's discipline matters are not similar enough to suggest that he needs progressive discipline as a recidivist offender who did not learn from his prior case. His present misconduct occurred during his own bankruptcy proceeding where he was represented by counsel. In contrast, the misconduct in his prior case occurred during the practice of law. Nor is this a case where Colton committed increasingly serious misconduct – failing to ensure the bankruptcy Questionnaire's accuracy is less concerning misconduct than recklessly aiding clients to file false tax returns. Thus, imposing progressive discipline would not serve the goals of attorney discipline and would be manifestly unjust to Colton. (See *In the Matter of Downey* (Review Dept. 2009) 5 Cal. State Bar Ct. Rptr. 151, 157 [progressive discipline warranted where misconduct aggravated by serious discipline record and dishonesty].)

**B.      Public Reproval with Conditions Is Appropriate Discipline**

Standard 3.4 provides that discipline for a criminal conviction involving "other misconduct warranting discipline" should appropriately reflect the nature and extent of the misconduct. As noted, Colton's misconduct involves his careless failure to review the bankruptcy Questionnaire. Such negligence reflects poorly on his judgment and the legal profession in general.

The parties disagree on which standard applies. The State Bar asserts that Colton's criminal *conviction* for contempt is akin to a violation of section 6103 (willful violation of court order) and therefore standard 2.6 applies, calling for disbarment or suspension. Colton argues that his *misconduct* – submitting an inaccurate Questionnaire to the Trustee – is comparable to failing to act competently, in violation of rule 3-110(A) of the Rules of Professional Conduct.[10] Colton is correct because we examine the facts and circumstances surrounding the crime, not the conviction itself. (See *In re Gross* (1983) 33 Cal.3d 561, 568 [misconduct, not conviction,

---

[10] All further references to rules are to this source, unless otherwise noted.

warrants discipline]; *In the Matter of Respondent O* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 581, 589, fn. 6 [whether acts underlying conviction amount to professional misconduct "is a conclusion that can only be reached by an examination of the facts and circumstances surrounding the conviction"].)

Violations of rule 3-110(A) fall within standard 2.4(b).  (*In the Matter of Broderick* (Review Dept. 1994) 3 Cal. State Bar Ct. Rptr. 138, 157.)  This standard calls for a reproval or suspension depending on the gravity of the offense or harm, if any, to the victim.  The State Bar conceded at trial that although Colton's present misconduct was not minimal, "it was not of the most severe nature."  We agree because it involved negligence, not dishonesty.  The State Bar did not argue or prove harm and presented little, if any, evidence other than the conviction itself. Colton, on the other hand, established mitigation that outweighs the limited aggravating weight of his remote 1985 prior discipline matter.  Perhaps most significantly, Colton has not committed further ethical violations in nearly 12 years since his 2001 misconduct, while increasing his service to the community.

In light of Colton's 34 years of practicing law, his minimal misconduct, and his strong mitigating evidence, we conclude that a public reproval with conditions will adequately protect the public, the courts, and the legal profession.  Comparable case law fully supports this discipline.  (See *In the Matter of Fonte* (Review Dept. 1994) 2 Cal. State Bar Ct. Rptr. 752, 757 [no culpability for rule 3-110 violation for failure to file answers to interrogatories after fourth time extension where simple calendar error due to recent computer change]; *In the Matter of Respondent G* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 175 [private reproval with conditions for repeatedly failing to perform legal services by neglecting client's needs in probate case]; *In the Matter of Hanson, supra,* 2 Cal. State Bar Ct. Rptr. 703 [public reproval with

conditions for failing to promptly return unearned fee with 17-year-old prior discipline; no

culpability for isolated rule 3-110 violation for filing late response to motion to dismiss].)

## IV. ORDER

Roland Clark Colton is ordered publicly reproved, to be effective 15 days after service of

this opinion and order.  (Rules Proc. of State Bar, rule 5.127(A).)

Further, Roland Clark Colton must comply with specified conditions set forth in this

order.  (Cal. Rules of Court, rule 9.19; Rules Proc. of State Bar, rule 5.128.)  Failure to comply

with any condition may constitute cause for a separate proceeding for willful breach

of rule 1-110.

Roland Clark Colton is ordered to comply with the following conditions for a period of

one year following the effective date of this order:

1. He must comply with the provisions of the State Bar Act and the Rules of Professional Conduct.

2. Within 10 days of any change in the information required to be maintained on the membership records of the State Bar pursuant to Business and Professions Code section 6002.1, subdivision (a), including his current office address and telephone number, or if no office is maintained, the address to be used for State Bar purposes, he must report such change in writing to the Membership Records Office and the State Bar Office of Probation.

3. Within one year of the effective date of this public reproval, he must submit to the Office of Probation satisfactory evidence of completion of the State Bar's Ethics School and passage of the test given at the end of that session.  This requirement is separate from any Minimum Continuing Legal Education (MCLE) requirement, and he shall not receive MCLE credit for attending Ethics School.

4. He must take and pass the Multistate Professional Responsibility Examination administered by the National Conference of Bar Examiners within one year of the effective date of this public reproval and provide satisfactory proof of such passage to the Office of Probation within the same period.

5. Subject to the assertion of applicable privileges, he must answer fully, promptly, and truthfully, any inquiries of the Office of Probation that are directed to him personally or in writing, relating to whether he is complying or has complied with the conditions contained herein.

## V. COSTS

We further recommend that costs be awarded to the State Bar in accordance with Business and Professions Code section 6086.10, such costs being enforceable both as provided in section 6140.7 and as a money judgment.

PURCELL, J.

WE CONCUR:

REMKE, P. J.

EPSTEIN, J.

0063

INTERNATIONAL LTD.
JANICE LYNN COLTON
J.K.M. FAMILY TRUST
DATED JULY 28, 1981

**Case Type**          A60507 FRAUD

**VIEW CASE DETAILS**

**Case Name**          **STRAHLE VS POLLOCK AND COLTON**

**State**              CA

**Plaintiff**          FREDERIC STRAHLE
                       EUNICE STRAHLE
                       TRUSTEES OF THE
                       STRAHLE TRUST OF
                       1986

**Defendant**          POLLOCK AND COLTON
                       ROLAND C. COLTON
                       JAMES POLLOCK
                       RICHARD SACKS &
                       INVESTORS RECOVERY
                       SERVICE
                       JAMES J. SULLIVAN

**Case Type**          A60510 MALPRACTICE

**VIEW CASE DETAILS**

10/17/2018                              Roland C Colton Court Case Reco

# JuralIndex

## Receive Free Case Docket Alerts For <u>Roland C Colton</u>

Sign up to
receive <u>free</u>
<u>email alerts</u>     Enter Your
when we                          
receive new
cases matching
**"Roland C
Colton"**

Page **1** of about **1,448,683** results for **Roland C Colton**

| | |
|---|---|
| **Case Name** | **COLTON VS WEISFELD** |
| **State** | CA |
| **Plaintiff** | ROLAND C COLTON |
| **Defendant** | GARY B WEISFELD |
| **Case Type** | A60304 BREACH OF CONTRACT |

VIEW CASE DETAILS

| | |
|---|---|
| **Case Name** | **CARR VS COLTON** |
| **State** | CA |
| **Plaintiff** | RONALD P CARR |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A11201 SMALL CLAIMS |

VIEW CASE DETAILS

| | |
|---|---|
| **Case Name** | **MICHEL NAPOLITANO REALTY INC VS COLTON** |
| **State** | CA |
| **Plaintiff** | MICHEL NAPOLITANO REALTY INC<br>NAPOLITANO REALTY BETTER HOMES AND GARDENS |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60614 OTHER CIVIL COMPLAINT |

VIEW CASE DETAILS

| | |
|---|---|
| **Case Name** | **BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION VS COLTON** |
| **State** | CA |
| **Plaintiff** | BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION |
| **Defendant** | ROLAND C. COLTON |

0066

Roland C Colton Court Case Reco

| | |
|---|---|
| **Case Type** | A60609 MONEY DEMAND |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **AYLWARD BINGMAN VS COLTON** |
| **State** | CA |
| **Plaintiff** | LYNN M AYLWARD BINGMAN |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60507 FRAUD |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **ANTINONE VS COLTON** |
| **State** | CA |
| **Plaintiff** | LAWRENCE ANTINONE<br>CHERYL ANTINONE |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60308 PROMISSORY NOTE |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **COLUMBIA SQUARE ASSOCIATES VS COLTON** |
| **State** | CA |
| **Plaintiff** | COLUMBIA SQUARE ASSOCIATES |
| **Defendant** | ROLAND C. COLTON |
| **Case Type** | A60410 UNLAWFUL DETAINER |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **ATENCIO VS COLTON** |
| **State** | CA |
| **Plaintiff** | JOE A ATENCIO |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60507 FRAUD |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **MONTEE VS COLTON** |
| **State** | CA |
| **Plaintiff** | TRACY G MONTEE<br>LINDA C MONTEE |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60507 FRAUD |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **OLIVER VS COLTON** |

0067

10/17/2018                                    Roland C Colton Court Case Reco

| | |
|---|---|
| **State** | CA |
| **Plaintiff** | STEPHEN M OLIVER |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60507 FRAUD |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **SCHNEIDER VS COLTON** |
| **State** | CA |
| **Plaintiff** | OTTO SCHNEIDER |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60507 FRAUD |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **WHEAT VS COLTON** |
| **State** | CA |
| **Plaintiff** | WILLIAM WHEAT |
| **Defendant** | ROLAND C COLTON |
| **Case Type** | A60308 PROMISSORY NOTE |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **SAN DIEGO TRUST &SAVINGS BANK VS COLTON** |
| **State** | CA |
| **Plaintiff** | SAN DIEGO TRUST &SAVINGS BANK BANKCARD SERVICES |
| **Defendant** | ROLAND C COLTON JANICE L COLTON |
| **Case Type** | A60307 GUARANTY |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **CORN VS COLTON** |
| **State** | CA |
| **Plaintiff** | CURTIS J CORN |
| **Defendant** | ROLAND C COLTON JANICE L COLTON |
| **Case Type** | A60308 PROMISSORY NOTE |

**VIEW CASE DETAILS**

| | |
|---|---|
| **Case Name** | **COLTON VS SCHREIBER** |
| **State** | CA |
| **Plaintiff** | ROLAND C. COLTON JANICE L. COLTON J.K.M. FAMILY TRUST |

10/17/2018                                  Roland C Colton Court Case Reco

| | |
|---|---|
| **Defendant** | ALEXANDER, JR. SCHREIBER |
| | ASPAS DEVELOPERS, INC. |
| | RICHARD D. BOKAL |
| | BOKAL KELLEY-MARKHAM |
| | BOKAL KELLEY-MARKHAM ARCHITECTS |
| | CARMEL BUILDING PRODUCTS |
| | D & R ROOFING |
| | DODDS, INC. |
| | DON CLARK ROOFING |
| | GORDON SKYLIGHTS ODL, INC. |
| | KURT D. MYERS LANDSCAPE CONSTRUCTION |
| | DOUG LEHNER |
| | KURT D. MYERS |
| | NORTH COUNTY GUNITE |
| | ODL, INC. |
| | SOUTHERN CALIFORNIA SOIL & TESTING, INC. |
| | STERLING PACIFIC BUILDING MATERIALS |
| | WESTERN PACIFIC SOLAR |
| **Case Type** | A60304 BREACH OF CONTRACT |

**VIEW CASE DETAILS**

**1** 2 3 4 5 6 7 8 9 10 Next

▷ ✕

**Not the <u>Roland C Colton</u> you were looking for? Run a new search below.**

roland c colton

**Search by:**
• all    plaintiff    defendant    case name

**Search by State: (optional)**

Select a state                                                                      ▼

**FIND THIS CASE!**

9/10/2018   United States v. Colton, Case Number: 06CR2252-W | Casetext



# United States
# v.
# Colton

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA    Dec 21, 2011    Full title

Case Number: 06CR2252-W (S.D. Cal. Dec. 21, 2011)    Copy Citation

THOMAS J. WHELAN

## JUDGMENT IN A CRIMINAL CASE

## (For Offenses Committed On or After November 1, 1987)

Roland C Colton

Defendant's Attorney

REGISTRATION NO, 67644098

[]

THE DEFENDANT:

[×] Pleaded guilty to counts superseding information

[] was found guilty on count(s) _____ after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

+-------------------------------------------------+ ¦ ¦ ¦**Count** ¦ ¦**Title & Section** ¦**Nature of Offense** ¦ ¦ ¦ ¦ ¦**Number**(s) ¦ +---------------+-----------------------+----------¦ ¦18 usc 401(3) ¦contempt (misdemeanor)¦1 ¦ +-------------------------------------------------+

The defendant is sentenced as provided in pages 2 through 3 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s) _____

9/10/2018                                    United States v. Colton, Case Number: 06CR2252-W | Casetext

Get unlimited access to everything you need for legal research!                    Start your free trial!

casetext        Search millions of legal authorities...        JX    🔍    Sign In    Free Trial    ?

[×] Fine waived [ ] Forfeiture pursuant to order filed _____, included herein.

🔍 Find in document        ✕    0/0    ∧  ∨    defendant shall notify the United States attorney for this district

within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

<u>DECEMBER 19, 2011</u>


Date of Imposition of Sentence


_____


HON. THOMAS J. WHELAN


UNITED STATES DISTRICT JUDGE


## PROBATION

The defendant is hereby sentenced to probation for a term of: TWO (2) YEARS

The defendant shall not commit another federal, state, or local crime.

*For offenses committed on or after September 13, 1994:*

The defendant shall not illegally possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter as determined by the court Testing requirements will not exceed submission of more than <u>8</u> drug tests per month during the term of supervision, unless otherwise ordered by court.

[ ] The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

[×] The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

[×] The defendant shall cooperate in the collection of a DNA sample from the defendant, pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000, pursuant to 18 USC sections 3563(a)(7) and 3583(d).

[ ] The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. (Check if applicable.)

Get unlimited access to everything you need for legal research!     Start your free trial!

casetext     Search millions of legal authorities...    ⌄    JX    🔍        Sign In    Free Trial    

the defendant pay any such fine or restitution in accordance with the Schedule of Payments sheet of this judgment.

🔍 Find in document          ✕   0/0   ^   ⌄    ly with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the special conditions imposed.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

3    *3 RESTITUTION

9/10/2018                        United States v. Colton, Case Number: 06CR2252-W | Casetext

Get unlimited access to everything you need for legal research!     Start your free trial!

casetext    Search millions of legal authorities...    JX   🔍    Sign In   Free Trial   ❓

\* as follows:

🔍 Find in document         0/0  ∧ ∨    ndant pay restitution in the amount of $405,811.00 through the Clerk, U.S. District Court. No restitution payments will be required for the first six months after entry of Defendant guilty plea, so long as Defendant undertakes best efforts to negotiate a payment plan with the Franchise Tax Board ("FTB") to resolve this debt. If Defendant and the FTB reach agreement as to a payment schedule, that same schedule will be the restitution payment schedule. If no payment plan is reached between Defendant and the FTB within six months, Defendant shall be required to pay restitution of $2,500 per month, beginning 7/20/12.

Restitution is to be paid to the following victim, and directed to the following address:

```
+---------------------------------+ |Name |Amount | +------------------------------+----------|
|California Franchise Tax Board| | | | | |Attn:Nancy Parker| | | | $405,811.00| |P.O Box 1720,
MS A-260 | | | | | |Rancho Cordova,Ca, 65741 | | +------------------------------+
```

Until restitution has been paid, the defendant shall notify the Clerk of the Court and the United States Attorney's Office of any change in the defendant's mailing or residence address, no later than thirty (30) days after the change occurs

The Court has determined that the defendant <u>does</u> have the ability to pay interest. It is ordered that:

_____ The interest requirement is waived.

_____ The interest is modified as follows:

Make your practice more effective and efficient with Casetext's legal research suite.

Request Demo

Pricing          About us          Help and FAQs
Features          Jobs              Contact us
                  Blog              ❤ Recommend
                  Podcast           Privacy
                  Students          Terms
                  News

© 2018 Casetext Inc.
Casetext, Inc. and Casetext are not attorneys or a law firm and do not provide legal advice.